THE ESTATE OF RUFUS N. RAMSAY, deceased,

*v.*

JOHN H. WHITBECK *et al.*

*Opinion filed February 19, 1900.*

1. APPEALS AND ERRORS—*Supreme Court may review facts where county court has exercised equitable powers.* If the allowance of a claim against an estate requires the exercise of the county court's equitable powers, the Supreme Court may review both facts and law upon appeal from the Appellate Court's judgment affirming the allowance of the claim.

2. PUBLIC OFFICERS—*State Treasurer's agreement for interest on deposit of public funds in banks is illegal.* An agreement by a State Treasurer to deposit public money in banks represented by his sureties, upon which interest is to be allowed him personally, is illegal, being in violation of section 81 of the Criminal Code and against public policy.

3. BONDS—*when sureties on Treasurer's bond must be considered as parties to illegal arrangement.* Sureties upon a State Treasurer's bond, executed in pursuance of an understanding that public funds will be deposited in the banks represented by them and interest be paid thereon to the Treasurer, are parties to such arrangement, which cannot be treated as having been made with the banks as corporate entities, so as to leave the sureties untainted with the transaction.

4. CONTRACTS—*when principal's implied promise of indemnity cannot be enforced.* An illegal agreement by a State Treasurer to deposit public funds in banks represented by his bondsmen, upon which interest is to be paid to him, and in consideration of which agreement they signed the bond, is so blended with the Treasurer's implied promise to indemnify the sureties against loss that the latter can not be enforced.

5. EVIDENCE—*illegal agreement to receive interest need not be proved by direct evidence.* An illegal agreement by a State Treasurer to receive interest on public funds deposited in banks represented by his bondsmen may be tacit as well as express, and its existence may be established by proof of facts and circumstances showing co-incidences which can be accounted for upon no other assumption than that such an original understanding existed.

*Estate of Ramsay* v. *Whitbeck,* 81 Ill. App. 210, reversed.

APPEAL from the Appellate Court for the Fourth District;—heard in that court on appeal from the Circuit Court of Clinton county; the Hon. SAMUEL L. DWIGHT, Judge, presiding.

M. P. MURRAY, (G. VANHOOREBEKE, JOHN G. IRWIN, T. E. FORD, JOHN J. McGAFFIGAN, and D. KINGSBURY, of counsel,) for appellant:

In chancery cases, issues of fact are reviewable by this court on appeal from or writ of error to the Appellate Courts of the State. The statute limiting the powers of this court in reviewing cases upon issues of fact has no application to chancery cases. *Fanning* v. *Russell*, 94 Ill. 386; *Stillman* v. *Stillman*, 99 id. 196; *Moore* v. *Tierney*, 100 id. 207; *Miller* v. *Cook*, 135 id. 190; *People* v. *Diedrich*, 141 id. 665; *Warren* v. *Bank*, 149 id. 9; *Belleville* v. *Railroad Co.* 152 id. 171; *Bliss* v. *Seaman*, 165 id. 422.

County courts exercise equitable jurisdiction in trying claims, and may adopt chancery procedure. *Moore* v. *Rogers*, 19 Ill. 347; *Dixon* v. *Buell*, 21 id. 203; *Moline Water Power Co.* v. *Webster*, 26 id. 233; *Hurd* v. *Slaten*, 43 id. 348; *In re Steele*, 65 id. 322; *People* v. *Harrison*, 82 id. 84; *Cheney* v. *Roodhouse*, 135 id. 257; *Bliss* v. *Seaman*, 165 id. 425; *Rawson* v. *Corbett*, 150 id. 466.

Where parties are concerned in illegal agreements or transactions, whether *mala prohibita* or *mala in se*, courts of equity, following the rule of law as to participants in a common crime, will not grant any relief. They act upon the maxim, *in pari delicto est conditio defendentis.* *Miller* v. *Markle*, 21 Ill. 152; Story's Eq. Jur. sec. 298.

Where part of an entire consideration for a promise is illegal the whole contract is void. *Henderson* v. *Palmer*, 71 Ill. 582; *Pickering* v. *Cease*, 79 id. 328; *Tobey* v. *Robinson*, 99 id. 233; *Tenney* v. *Foote*, 95 id. 109.

Public policy will not permit a party to enforce a promise which was obtained by an illegal act or promise, although he may connect this act or promise with another which is legal. *Harris* v. *Hatfield*, 71 Ill. 298; *Nash* v. *Monheimer*, 20 id. 215; *Neustadt* v. *Hall*, 58 id. 172; *Henderson* v. *Palmer*, 71 id. 583; 1 Parsons on Contracts, 457.

Where the immediate object or consideration of an agreement is not unlawful but the intention of the par-

ties to it is unlawful, or one party's intention to it is unlawful and the other knows it to be so, the agreement is void. 3 Am. & Eng. Ency. of Law, 887; *Hananer v. Doans,* 12 Wall. 342.

An agreement, though subsequent to the making of a lawful agreement, makes the latter void if it is part and parcel of one unlawful scheme. 3 Am. & Eng. Ency. of Law, 889; *Armstrong* v. *Toller,* 11 Wheat. 258.

Any security for the payment of money under an unlawful agreement is itself void, even if the giving of the security was not a part of the original agreement. *Clay* v. *Roy,* 17 C. B. (N. S.) 188; 3 Am. & Eng. Ency. of Law, 889; *Fisher* v. *Budges,* 2 E. & R. 118; *Greene* v. *Worthington,* 11 Ex. 146; *Geeil* v. *Mare,* 2 H. & C. 339.

A contract may be illegal because an offense is contemplated as its ulterior result, or because it invites to the commission of crime. 3 Am. & Eng. Ency. of Law, 870; *Poplett* v. *Stockdale,* 1 R. & M. 337.

An agreement the object of which is to induce any officer of the State to act partially or corruptly is void. If it even have that tendency it is void. 3 Am. & Eng. Ency. of Law, 877; *Bush* v. *Allen,* 80 Ky. 681.

A mutual understanding is tantamount to an agreement. *Kilpatrick* v. *Helston,* 25 Ill. App. 127.

R. L. TATHAM, and FOLLANSBEE & FOLLANSBEE, for appellees:

A judgment of affirmance by the Appellate Court must be taken as a finding of all such facts as were necessary to sustain the judgment of the trial court, involved on the issues at law, and such finding must be accepted as true. *Hobbs* v. *Ferguson's Estate,* 100 Ill. 232; *Fitzsimmons* v. *Cassell,* 104 id. 352; *Edgerton* v. *Weaver,* 105 id. 43; *Barber* v. *Hawley,* 116 id. 91; *Darlington* v. *Chamberlain,* 120 id. 585; *Montgomery* v. *Black,* 124 id. 57; *Bank* v. *Bornman,* 124 id. 200; *Waldron* v. *Alexander,* 136 id. 550; *Hawes* v. *Sternheim,* 156 id. 341; *Bliss* v. *Seaman,* 165 id. 422.

If a party, for a legal consideration, undertakes to do two or more acts, and a part of them are lawful and a part unlawful, the contract is good for so much as is lawful and void only as to the unlawful part, and the legal promise may be enforced at law. *Corcoran* v. *Coal Co.* 138 Ill. 390; 1 Parsons on Contracts, (6th ed.) 457; *Osgood* v. *Bauder & Co.* 75 Iowa, 550; *Widoe* v. *Webb,* 20 Ohio St. 434; *Doty* v. *Knox County,* 16 id. 142; *Kerrison* v. *Cole,* 8 East, 231; *Mouys* v. *Leake,* 8 T. R. 411; *Holt* v. *Green,* 73 Pa. 198; *Swan* v. *Scott,* 11 S. & R. 164; *Thomas* v. *Brady,* 10 Barr, 164; *Scott* v. *Duffy,* 2 Harr. 20; *Armstrong* v. *Bank,* 133 U. S. 433.

The doctrine arising from the maxim *ex turpi causa non oritur actio,* is confined to misconduct in regard to, or at all events immediately connected with, the matter in litigation. It does not extend to any misconduct, however gross, which is unconnected therewith or with which the opposite party is unconcerned. 1 Pomeroy's Eq. Jur. sec. 399; *Armstrong* v. *Bank,* 123 U. S. 433; *Brooks* v. *Martin,* 2 Wall. 70; *Foster* v. *Winchester,* 92 Ala. 497; *Sharp* v. *Taylor,* 2 Phil. Ch. 801; *Bateman* v. *Ferguson,* 2 Flippin, 660; *Lewis & Nelson's Appeal,* 67 Pa. St. 153; *Guilfoil* v. *Arthur,* 158 Ill. 600; Greenhood on Public Policy, 20, 127, rule 19; *Smith* v. *Richards,* 23 Conn. 232; *Planters' Bank* v. *Union Bank,* 16 Wall. 493; *Wells* v. *McGeoch,* 71 Wis. 195; *Sluby* v. *Champlin,* 4 Johns. 461; *Smith* v. *Rives,* 32 Me. 177.

The State, if it had not been reimbursed by the sureties, would have been entitled to have had its demand against Mr. Ramsay's estate classified as a claim of the sixth class, as the funds which were in the hands of the State Treasurer were funds that were "held in trust" by him, within the meaning of the sixth clause of section 70 of chapter 3 of the Revised Statutes. *Matteson* v. *Kellogg,* 15 Ill. 547; *Chapman* v. *Forsythe,* 2 How. 202; *Fitzsimmons* v. *Cassell,* 98 Ill. 332; *Wilson* v. *Kirby,* 88 id. 566; *Weer* v. *Gand,* 88 id. 490; *Tracey* v. *Hadden,* 78 id. 30; *Shipherd* v. *Furness,* 153 id. 590; *Svanoe* v. *Jurgens,* 144 id. 507; *Morse* v. *Lowell,*

7 Metc. 152; *Crisfield* v. *State*, 55 Md. 192; *Tinuchi* v. *Smart*, 54 L. J. P. C. 92; *Simpson* v. *Simpson*, 80 N. C. 332; *Heffron* v. *Jayne*, 39 Ind. 463; *Hennequin* v. *Clews*, 77 N. Y. 427; *Cronan* v. *Cotting*, 104 Mass. 245; Lewin on Trusts, 1, 16, 1021.

The appellees, having been obliged to make good the deficit, are entitled to be subrogated to all of the rights which the State of Illinois would have had if it had filed its claim against the estate of Mr. Ramsay. *Foss* v. *Chicago*, 34 Ill. 488; *Howe* v. *Insurance Co.* 57 id. 318; *Jacques* v. *Fackney*, 64 id. 87; *Richeson* v. *Crawford*, 94 id. 165; *Beaver* v. *Slanker*, id. 175; *Fogarty* v. *Ream*, 100 Ill. 366; *Crawford* v. *Richeson*, 101 id. 351; *Lochenmeyer* v. *Fogarty*, 112 id. 572; *Hook* v. *Richeson*, 115 id. 431; *Dias* v. *Borchard*, 2 Edw. Ch. 435; Sheldon on Subrogation, secs. 87, 88; *Keokuk* v. *Love*, 31 Iowa, 119; 24 Am. & Eng. Ency. of Law, 220; *Regina* v. *Salter*, 1 H. & N. 274; *Matthews* v. *Aiken*, 1 Comst. 595.

FRANCIS A. RIDDLE, and JAMES E. MUNROE, for appellees, on petition for rehearing:

The only facts necessary to be proved to sustain the recovery by sureties on a bond are the execution of the bond by the principal and sureties, the breach of the bond by the principal, and the payment by the sureties of the damages arising from the breach; and such payment may be made without suit begun or threatened. 7 Am. & Eng. Ency. of Law, (2d ed.) 345, 349.

When a contract of suretyship is made, the law raises an implied promise by the principal to indemnify the sureties against any loss to which the latter may be subjected by reason of the contract. When loss to the sureties arises, the contract of the principal to make the loss good relates back to the time of the entering into of the contract of suretyship. *Choteau* v. *Jones*, 11 Ill. 318; *Rice* v. *Southgate*, 16 Gray, 142.

The right to indemnity, as between the principal and his sureties, rests on a contract implied from the equitable obligation, and not on the express contract under

which the common liability arose.  7 Am. & Eng. Ency. of Law, (2d ed.) 346.

As between the State and the sureties, the same consideration supported the undertaking of the sureties as applied between the State and the principal in the bond. As between the sureties and the principal, the consideration which supported the undertaking of the sureties was the implied promise of the principal to indemnify the sureties against all loss to them by reason of their becoming parties to the obligation. *Appleton* v. *Bascom*, 3 Metc. 171; *Martin* v. *Ellerbe*, 70 Ala. 326; *Miller* v. *Stout*, 5 Del. Ch. 263; *Howe* v. *Ward*, 4 Me. 195; *Thompson* v. *Thompson*, 19 id. 244; *Morrow* v. *Morrow*, 2 Tenn. Ch. 555.

The law will presume in favor of honesty and against fraud. It will also strongly presume against the commission of a crime. Broom's Legal Maxims, (7th ed.) 947.

It is not to be supposed that the parties to a contract intended, when they made it, to violate the law, and, therefore, when a contract is capable of two constructions, one of which makes it valid and the other void, the law will give it a construction which will uphold it. 1 Wharton on Contracts, sec. 337; *Crittenden* v. *French*, 21 Ill. 598; *Lewis* v. *Davison*, 4 M. & W. 653; *Lorillard* v. *Clyde*, 86 N. Y. 387; *Peckham* v. *Haddock*, 36 Ill. 38.

If a party, for a consideration which is wholly legal, shall undertake to do two or more acts, one or more of which is or are legal and the balance illegal, the contract is enforcible as to the lawful promise or promises and void as to the residue. Metcalf on Contracts, 246; Clark on Contracts, 474; *Gaskell* v. *King*, 11 East, 165; *Kerrison* v. *Woodman*, 8 id. 236; *Pickering case*, L. R. 3 C. P. 250; *Erie Railway Co.* v. *Express Co.* 35 N. J. L. 240; *Corcoran* v. *Coal Co.* 138 Ill. 390; 1 Parsons on Contracts, (7th ed.) 456, 457.

Where, for one consideration, two or more promises are made, part legal and part illegal, the former will be enforced, and no distinction is now recognized between

illegality founded on the common law and on a statute, unless the statute declares the whole contract void. Lawson on Contracts, sec. 339; 1 Parsons on Contracts, 458.

R. L. TATHAM, and FOLLANSBEE & FOLLANSBEE, also for appellees, on petition for rehearing.

Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

On November 8, 1892, Rufus N. Ramsay was elected Treasurer of the State of Illinois for two years from the second Tuesday of January, 1893. On December 20, 1892, he, with ten sureties, executed a bond in the sum of $500,000 to the State of Illinois, conditioned for the faithful discharge of his duties as such treasurer. He entered upon the duties of his office January 10, 1893, and died during his term, on November 11, 1894. At that time there should have been in the treasury $1,510,383.14, and an examination showed that there was but $1,031,843.62, leaving a deficit of $478,539.52. This deficit was paid, on behalf of the sureties, by check drawn by F. M. Blount upon the Chicago National Bank, of which he was cashier. The bank was reimbursed by the sureties. After making up the deficit the sureties received $115,000 thereon by the collection of notes of individuals and securities found in the vault of the treasury. For the balance, $363,539.52, the sureties filed a claim in the county court of Clinton county against the estate of Ramsay, and applied to the court to be subrogated to the rights of the State of Illinois and to have the claim allowed as a preferred claim of the sixth class. The estate being insolvent, the general creditors of the seventh class, with the administrator, objected to the claim and resisted its allowance. The defense made was, that by reason of an unlawful consideration moving to the claimants for becoming sureties upon the bond, the transaction as between them and Ramsay was vitiated, and in consequence

thereof they had no right to reimbursement which the
law would recognize or enforce.   This illegality was al-
leged to consist in a mutual agreement of the Treasurer
and his sureties for the unlawful use of the money of the
State for the benefit of the Treasurer and certain banks,
of which the sureties were officers and representatives,
contrary to the public policy of the State and in con-
travention of its statutes.   The county court decided
in favor of the claimants and entered judgment for the
amount of the claim as of the sixth class, and ordered it
paid in due course of administration.   From that judg-
ment an appeal was taken to the circuit court, and there
was a hearing which resulted in a reversal of the order
of the county court and a disallowance of the claim.   On
appeal to the Appellate Court for the Fourth District
the judgment of the circuit court was reversed, and the
cause was remanded generally for further proceedings.
A petition for rehearing was filed and granted.   A change
had taken place in the membership of the court, and the
cause was re-considered by the present members of that
court, but the judgment was adhered to and the opinion
re-filed.   The case was re-docketed in the circuit court
and additional testimony was taken.   On the first trial
certain officers of the bank testified, by deposition, and
under advice of counsel refused to answer whether there
was any arrangement between Ramsay and the sureties
by which Ramsay was to furnish money for the banks
of the sureties, in consideration of which he was to re-
ceive any benefit, directly or indirectly, from the banks.
In the additional evidence they testified to the circum-
stances under which the bond was given.   The case was
again heard on the original testimony and the additional
evidence, and the claim was allowed as of the sixth class.
The amount was reduced somewhat by credits and the
allowance was for $351,948.41.   The judge filed a written
opinion in the case, stating that the Appellate Court had
held there were two contracts, one lawful and the other

unlawful,—two considerations, one lawful, the other un-
lawful,—for executing the bond, and that the unlawful
contract and consideration did not taint the one which
was lawful, and this conclusion he felt bound to follow
from the obedience due to the superior court.   He stated
that but for the opinion of the Appellate Court on sub-
stantially the same evidence he should adopt a different
view, but was constrained to accept the conclusion of
the Appellate Court, which he would not do if free to
act otherwise.   The death of Edson Keith and William
A. Hammond, two of the claimants, was suggested, and
judgment was entered in favor of the surviving claim-
ants, for the amount of the claim.   An appeal was again
taken to the Appellate Court for the Fourth District and
the judgment was affirmed.   This further appeal has been
prosecuted from the judgment of the Appellate Court.

It was a controverted question of fact before the cir-
cuit court whether there was an illegal contract between
Ramsay and the sureties, and appellees contend that the
judgment of the Appellate Court has settled that ques-
tion in their favor, and that such finding is conclusive
and not open to review in this court.   All claims against
estates of deceased persons are presented to the county
court, and such claims are sometimes legal and some-
times equitable in character.   Those courts, therefore,
hear and decide upon claims of both classes.   If the
claim be of an equitable character, it is, of course, gov-
erned by the principles of equity and the rules of equity
procedure.   It calls for the exercise of the equitable ju-
risdiction of the county court, which may adopt the forms
of equity procedure.   The hearing of causes of that char-
acter upon appeal has always been upon the merits on
the evidence in the record.   In such cases we review and
determine the facts for ourselves, and they are not within
the meaning of the statute which makes the judgment of
the Appellate Court conclusive as to matters of fact.   In
this case, Ramsay had received money as Treasurer of

the State, and his sureties contend that, having so re-
ceived it, he held it in trust within the meaning of the
statute, so that a claim for the money was a preferred
claim against his estate.  They say that if a claim had
been presented by the State of Illinois the State would
have been entitled to have it classified as of the sixth
class, and as they had made the loss good to the State
they are entitled to be subrogated to its rights.  By the
principles of equity a surety who has paid his principal's
debt becomes the equitable assignee of securities which
the creditor held, and is entitled to be substituted.  This
subrogation is a creature of equity and the operation of
the doctrine is controlled exclusively by the principles
of equity.  The power of the county court to grant such
equitable relief was invoked, but appellees claim that
the jurisdiction of that court was divisible; that their
claim was a common law claim until it was allowed and
then became an equitable claim for classification.  They
propose to divide their suit into sections, and have part
of it at law and part in equity.  That cannot be done.
There are no artificial divisions of a chancery suit.  If a
party asks relief which a court of equity alone can grant,
his suit is in equity.  The record is before us both upon
questions of fact and of law.  *Bliss* v. *Seaman*, 165 Ill. 422.

The unlawful agreement, the existence of which is af-
firmed on the one hand and denied on the other, is, that
the sureties on the bond, who were officers of five banks
in the city of Chicago, representing said banks and in
their interest, became sureties because of an agreement
that the Treasurer should loan to said banks a large
amount of the State funds, upon which they were to al-
low and pay him interest monthly, at the rate of two and
one-half per cent per annum, and that pursuant to such
an agreement over $1,500,000 was loaned to said banks
about the time the Treasurer went into office, and sub-
stantially that sum remained in said banks until his
death, and the stipulated interest was regularly paid to

him according to the agreement. The evidence in the record upon that subject is as follows:

Ramsay lived at Carlyle, in Clinton county, and had a bank there. John A. King was president of the Fort Dearborn National Bank in Chicago, and that bank was the Chicago correspondent of the Carlyle bank and had done business with it for some time. Ramsay was a candidate for State Treasurer, and King was his strong personal friend and worked for him and with him to secure his election. After Ramsay was elected he said to King that the question was whether he should make his bond in Chicago or at Springfield, and King offered to make the bond. Ramsay seems to have had in mind the place where the bond would be made rather than who would sign it, and was undecided. He made no reply to King, but after going home he decided upon Chicago as the place, and either came back or sent the bond to King at Chicago to be executed. King, being a warm friend of Ramsay, would have signed the bond with no other motive than to aid him and without any pay or other consideration. At that time Wilson was State Treasurer, and five banks in Chicago had each received from him $350,000 of State money. These banks were the Fort Dearborn National Bank, of which King was president; the Metropolitan National Bank, the Chicago National Bank, the National Bank of Illinois and the Corn Exchange Bank. Officers of these banks were sureties on Wilson's bond. King thinks that about this time representatives of one or two of these banks came to him and asked him if he was going to make Ramsay's bond, and he said he thought he was, or wasn't sure yet, or something to that effect. The moneys of the State in these banks were represented by certificates of deposit, reciting that some officer of the particular bank had deposited in such bank the sum of money, payable to his order on the return of the certificate, and this was endorsed by such officer. None of the certificates bore interest upon

their face, and they were not issued to the Treasurer but to some one connected with the bank. The defendant sought to prove that the banks were paying interest to Wilson on this State money, but the court sustained objections to such questions and there is no direct evidence on the subject. When King received the bond he signed it and had another officer of his bank sign it, and then went to some of the other banks and sent a messenger to the remainder, and requested them to have representatives of the banks sign the bond. He says: "The ten bondsmen were directors of five banks, divided up,—officers or something. * * * They represented those five banks. Two would represent a bank." The president of the Chicago National Bank testifies that King told him he wanted to make Ramsay's bond in Chicago, and wanted the witness to sign it and get somebody else of the bank people to sign. The witness selected McNally, who was a director, and they signed the bond. Ramsay had no talk with any of the sureties except King, and nothing was said between him and King about the State money or the payment of any interest. Ramsay assumed office January 10, 1893, and when he received the State money he took the certificates issued by these banks as money and brought them to King, at Chicago, on January 12, 1893. He told King to have the dates changed, and to pay over any interest coming due him, to his brother, Dr. Ramsay, or send it to his bank at Carlyle. There were two of these certificates issued by the Fort Dearborn National Bank, and instead of changing the date King made two new certificates exactly the same, reciting that he had deposited the money in the bank payable to his order. He took or sent the other certificates to the other banks, where the same thing was done and like changes were made at all the banks. The certificates bore no interest, but the banks paid interest monthly, at the rate of two and one-half per cent per annum. King told the other banks the rate of interest that they had to pay,

which he says he thought was about right. Nothing was ever said about it except in that way. The certificates were in the same form, and this is a copy of one of them:

"$250,000.00.    THE CHICAGO NATIONAL BANK.
"No. 16966.    CHICAGO, *January 12, 1893.*

"F. M. Blount, assistant cashier, has deposited in this bank two hundred and fifty thousand dollars, payable to his order on the return of this certificate.    F. M. BLOUNT, *Cashier.*"
"$250,000.00.

(On margin):    "C. L. DAY, *Teller.*"
(Indorsed on back):

"Pay Chicago Nat. Bank.—F. M. BLOUNT, *Cashier.*
(Stamp.)    Credit of R. N. Ramsay, State Treasurer.
"Chicago National Bank, Oct. 10, '93.—Paid."

Although nothing was said on the subject, it is not necessary that the understanding should be established by something that was said, but it may be arrived at from all the circumstances, in the light of experience and common observation. That the banks understood that what was done would be done is unquestionable. Although one of the witnesses says that the interest was paid to King because he requested it, he also says that they did not pay out money simply on the score of friendship. The president of the Metropolitan National Bank testifies that the bond was brought to him and he signed it, and he "supposed there would be a deposit in the bank of some kind; there never was any deposit there in Ramsay's name, but there was money belonging to the State Treasurer; supposed it did; never knew it positively; we never had an account with Rufus N. Ramsay as State Treasurer; all the money which we had, which I supposed at the time was the State Treasurer's, was taken in certificates of deposit." The president of the Chicago National Bank testifies that "when I went on that bond I had no assurance from anybody that we could get the use of the State money in doing so; we did not talk about such things,—would not be likely to; there was nothing

said on the subject; there might have been something understood; I did not have very much understanding about it; I knew if it led to any deposit we would have to pay for it, and I was indifferent about it; knew if the money was deposited we would have to pay interest on it." It is true that King testifies that there was no understanding between him and Ramsay under which they paid interest on the money; but that statement is a mere conclusion of the witness that what occurred would not amount to an understanding. It is a mere inference from the manner in which he construed the effect of what occurred. The facts are before us, and it is for the court to draw the conclusion as to whether there was a mutual understanding when the bond was executed. It is equally clear that Ramsay had the same understanding as the banks. It was a question with him where the bond was to be made—whether in Springfield or Chicago. The money was in the banks in Chicago, and although there is no direct evidence that they were paying interest on it to the State Treasurer, it is clear that Ramsay understood that they were, for he brought the certificates, which bore no interest on their face, to Chicago, and all he said about them to King was to have the dates changed and have the interest paid to his brother or sent to his bank at Carlyle. His conduct shows that he understood if he decided to have the bond made in Chicago the money was to stay there, and that interest was being paid and would be paid. That these things happened without any understanding would be contrary to common experience. There are too many coincidents to be accounted for except upon the assumption of an original understanding, whatever the conclusion of any witness may be as to what constitutes an understanding. It is true that King was inspired by friendship for Ramsay and that such friendship was one of the springs of his action; but that was not true as to any of the rest of the bondsmen, and if it were, it would not make any difference as to him or them.

The motive of an act and the consideration for it are not necessarily the same; and even if the banks had motives arising out of the highest regard for Ramsay and a beneficent desire to aid him and to protect the State from loss, yet if the contract was in consideration of interest, profit or benefit accruing under the illegal arrangement the whole transaction was void. The agreement may as well have been tacit as expressed in words, and that it existed there is no doubt.

This agreement which was made and executed was in direct and palpable violation of section 81 of the Criminal Code, which prohibits any State officer from using, by way of investment or loan, for his own use, except as authorized by law, with or without interest, any portion of the money entrusted to him for safe keeping, disbursement, transfer or any other purpose. (Rev. Stat. p. 363.) It was also against the public policy of the State. Section 23 of article 5 of the constitution provides as follows: "The officers named in this article shall receive for their services a salary to be established by law, which shall not be increased or diminished during their official terms, and they shall not, after the expiration of the terms of those in office at the adoption of this constitution, receive to their own use any fees, costs, perquisites or office, or other compensation. And all fees that may hereafter be payable by law for any service performed by any officer provided for in this article of the constitution, shall be paid in advance into the State treasury." Section 1 of chapter 53 of the Revised Statutes, (p. 500,) entitled "Fees and Salaries," provides: "That there shall be allowed and paid an annual salary, in lieu of all other salary, fees, perquisite, benefit or compensation, in any form whatsoever, to each of the officers herein named, the following sums respectively: * * * Treasurer, the sum of $3500."

Nothing is better settled in the law of contracts than that if any part of the consideration upon which a promise

rests is illegal the entire promise fails. (*Nash* v. *Mon-heimer*, 20 Ill. 215; *Henderson* v. *Palmer*, 71 id. 579; *Tenney* v. *Foote*, 95 id. 99; *Tobey* v. *Robinson*, 99 id. 222.) No one can gain any right by obtaining a promise founded upon considerations in violation of the law, and the courts will not destroy the respect due to the law by enforcing such a promise, but will leave the parties where they have placed themselves by their own conduct. This is not denied, and it is agreed by all the counsel in the case that where parties are engaged in illegal agreements or transactions courts will not enforce their promises. But while the rule of law is not questioned by appellees, they insist that there was no illegal contract by the sureties, but that the agreement is divisible as to parties between them and the banks. The supposed division is, that the illegal transaction was between Ramsay and the banks and not between him and the sureties; that he never agreed at any time with the sureties that if they signed the bond he would deposit State money with them; that whatever Ramsay agreed to do in the way of loaning State funds was with the banks, which were entities in law, and not with the individuals who signed the bond; that there was no agreement of the banks themselves prior to January 12, 1893, when the certificates were issued; that they were not certificates of the bondsmen; that the banks, and not the bondsmen, paid the interest and paid back the principal. This is a refinement in separating the parties to the transaction that we are not able to appreciate or approve. The sureties signed the bond as representatives of the banks, and they all understood it in that way. A bank cannot, as such, become a surety upon a bond, and it cannot have any understanding or make a contract except as its officers understand and make the promise. Upon the examination of the president of the Metropolitan National Bank he was asked if the banks were not the real sureties and not the individuals, and if the benefits which the banks received

from the State funds were not the consideration for becoming sureties, and his answer was, "There is no way of a national bank becoming surety on a bond." Again, he was asked if it was not the understanding that the officers would not have to pay anything, and answered, "We could not make such an agreement—it would not be legal." The president of the Chicago National Bank testifies that when he drew his check to make good the deficit he drew it with the expectation that he would be reimbursed, because the profits that would have accrued from the use of the money would have benefited the bank and he expected the bank to stand the loss. The officers signed the bond for the benefit of the banks, as their officers and representatives, and at least three of the banks have reimbursed them. This suit is being prosecuted for the benefit of the banks, and what the officers did in signing the bond and are doing now is by virtue of their official relations as agents of the bank. We cannot say that the banks are guilty, and that their officers, who made the bargain and did the business, are innocent.

Another division of the contract into legal and illegal parts is insisted upon for the purpose of bringing the claim within the rule that if there is a single legal consideration for two promises, one of which is legal and the other illegal, the lawful promise may be enforced. The rule has been stated as follows: "A distinction must be taken between the cases in which the consideration is illegal in part and those in which the promise founded on the consideration is illegal in part. If any part of a consideration is illegal the whole consideration is void, because public policy will not permit a party to enforce a promise which he has obtained by an illegal act or an illegal promise, although he may have connected with this act or promise another which is legal. But if one gives a good and valid consideration, and thereupon another promises to do two things, one legal and the other illegal, he shall be held to do that which is legal, unless

the two are so mingled and bound together that they cannot be separated, in which case the whole promise is void." (Parsons on Contracts, 457.) When a surety signs a bond the law raises an implied promise by the principal to reimburse the surety for any loss which he may sustain, and when a loss occurs this implied contract of indemnity relates back and takes effect from the time when the surety became responsible. (*Choteau* v. *Jones*, 11 Ill. 300.) Under this rule, when the sureties signed the bond of Ramsay the law implied a promise on his part to indemnify and save them harmless from all loss which they might sustain by reason of such signing, and when they made up the deficit this implied promise related back to the date of bond. This implied promise was perfectly lawful and legal, and it is said that if there was a separate promise on the part of Ramsay to keep the money in the banks it would not prevent a recovery by the sureties upon the lawful promise to reimburse them. This argument loses sight entirely of the consideration upon which Ramsay's promise rested. On the one side there was the implied promise of indemnity and the promise to deposit the money with the banks. The consideration on the other side was that the sureties would execute the bond and the banks which they represented would pay the interest. The consideration upon which the implied promise now sought to be enforced was made was the signing of the bond and the payment of interest to the Treasurer. The consideration moving from the sureties was not a single one, free from unlawful taint, but included pecuniary gain and advantage to the Treasurer by an unlawful agreement, under which they paid interest to him. Ramsay would not have wanted the sureties to sign the bond or allowed them to do it except for the unlawful agreement for his own pecuniary advantage. The arrangement, whether it resulted in gain for the banks or not, was made for that purpose and upon that consideration, and the transaction on the part of

Ramsay, on the other hand, was for his benefit, and it involved a violation of the criminal law and the public policy of the state. The promises are connected and so mingled and bound together that they are not separable. The claim cannot be brought within the exception stated. The law will not enforce the lawful implied promise of indemnity resting upon the illegal consideration that the banks would borrow money and pay interest on it. The parties were all engaged in the illegal enterprise and all are equally involved.

It is especially urged that we should adopt the view of the appellees that they did not enter into a contract forbidden by law, but that, at most, they had a mere hope or expectation that the law would be violated by deposits of money with their banks, which did not amount to an agreement to that effect, and it was this hope or expectation which was afterwards realized. It is said that they occupy honorable positions in the business world, and presumption against them should not be lightly indulged. We are slow to impute to any person a violation of the law unless the evidence requires,—and this rule applies to all persons, whether distinguished in the ranks of business life or not. The law is the same for all, and we cannot find these parties guiltless when the facts show the contrary. The whole evidence on the subject of the agreement came from them. They were called as witnesses by the defendant, and the facts we have stated are found in their testimony. We have given the case our best attention, both upon the original argument and the re-argument which was allowed, and are unable to reach any other conclusion.

The judgments of the Appellate Court and the circuit court of Clinton county are reversed and the cause is remanded to the circuit court, with directions to enter an order disallowing the claim.

*Reversed and remanded.*