In re Estate of Daniel M. Jackson, Deceased. Claim of William E. Harper and Clara G. Harper, Appellants, v. Charles S. Jackson, Executor of the Estate of Daniel M. Jackson, Deceased, Appellee.

Gen. No. 36,061.

Opinion filed December 30, 1932.

JAMES D. MURPHY, for appellants; FRANK F. TRUNK, of counsel.

ADOLPH MARKS, for appellee.

MR. JUSTICE SCANLAN delivered the opinion of the court.

William E. Harper and Clara G. Harper filed a claim against the estate of Daniel M. Jackson, deceased, in the probate court of Cook county. The claim was allowed "for the sum of $9397.50 less rebate for $540.46 class No. 6." An appeal was taken to the circuit court, where the cause was tried *de novo* by the court, without a jury, and there was a finding and judgment for the claimants for $1,396.37. The claimants have appealed.

Claimants owned the nine-room, three-story residence, at 3441 Michigan avenue, Chicago, and entered into a written lease with Emanuel Jackson Undertaking Corp., Daniel M. Jackson, Pres., for a 10-year term commencing May 1, 1924, at a monthly rental of $150. Daniel M. Jackson guaranteed the payment of the rent and the performance of the covenants of the lease. In the printed portion of the lease is a provision that the lessee would "not permit said premises to be used for any unlawful purpose," and in the typewritten portion a provision that the premises are "to be occupied for general undertaking business or any

legitimate business." Jackson died May 17, 1929. Rent was paid until October, 1929. The claim is as follows:

"Chicago, November 21st, 1929.

Due from
Estate of Daniel M. Jackson
To William E. Harper and
    Clara G. Harper
        *Re: 3441 Michigan Avenue.*

| | |
|---|---:|
| October rent, | 150.00 |
| November rent, | 150.00 |
| Rent for balance term of lease to April 30th, 1934 | 7950.00 |
| Fire Insurance on $15,000.00 to April 30th, 1934 | 247.50 |
| General Taxes 1928–1929–1930–1931– 1932–1933 @ $300.00 a year | 1800.00 |
| 1934–January to April inclusive | 100.00 |
| Total | 10397.50 |
| Less Guarantee Paid | 1000.00 |
| | 9397.50" |

The estate contends that the lease was entered into by the lessors with knowledge that the premises were to be used as a gambling house, and they knew, after Jackson took possession under the lease, that the premises were being used for gambling purposes and permitted such use, and that therefore the lease was void and could not be made the basis of a claim for rentals. The claimants contend: "The lease was entered into in good faith by the lessors. The premises were illegally used without knowledge of such use by the lessors"; that even if they learned, after Jackson took possession, that he was conducting a gambling house in the premises, nevertheless, the claimants would have no right to consider the lease at an end

and to take steps to oust Jackson until the latter had been arrested and convicted of keeping a common gambling house.

The undisputed evidence shows that from 1910 until his death Jackson conducted gambling houses on the south side of Chicago. Not only many officers and members of the Chicago police force, but thousands of people in the vicinity of the premises knew of Jackson's connection with gambling houses. Claimants state in their brief that Jackson entered into possession of the premises and had them "fixed up as a gambling house, and then conducted a lieutenant of police through the house before it began to operate as such. It is apparent that the police were not strangers to the fact that Dan Jackson, who was ward committeeman and later a member of the Illinois Utilities Commission, and undertaker, and politician conducted a gambling house upon the premises at 3441 Michigan avenue. In the trial of the case one captain of police, four lieutenants of police, seven officers of the City of Chicago, and one South Park policeman testified for the appellees that gambling paraphernalia and fixtures were in the place; that men were found therein with scratch sheets, and names of horses, jockeys, etc., were upon the walls. Employees, patrons and police have come into court to testify for the estate *that said premises were used in conducting a gambling house therein from 1924 to October 5, 1929,* when the place was raided, the fixtures destroyed and the premises abandoned. The police made two raids of the gambling house and placed men under arrest once in later part of 1926 and again on October 5, 1929. The men arrested were discharged and no conviction was had of anyone for a violation of law upon the premises during the entire period that the premises were so occupied. . . . No police officer ever did anything to suppress the nuisance or report the fact that the

house was fitted as a gambling house to the lessors. . . . It developed on the trial . . . that Jackson conducted a gambling house therein during his lifetime, which gambling house continued to operate after his death in June (May) 1929 until the place was raided by the police on October 5, 1929, whereupon the premises were abandoned in a bad state of repair and uninhabitable. . . . Here in the case at bar we have the sad spectacle of officers of the police of Chicago whose aggregate testimony shows that they knew of the existence of gambling upon the premises from 1924 to 1929, and yet were so impotent or neglectful, to put a kind construction upon their acts, that in all these years they could not go lawfully about simple police duties, secure a search warrant and lawfully conduct such search, arrest violators of the law and seize and destroy gambling apparatus there, but on the contrary they blunder up to a house with force and display of arms, arrest 11 or 13 patrol loads of men, never arrest the notorious (so they say) gambler, Dan Jackson, owner and keeper, and on the morrow the counsel for the prisoners makes a motion in court to suppress evidence, because it was secured by an unlawful search of the police without a search warrant. There was, of course, no conviction of inmates or keeper.'' The claimants, in their brief, further state that ''the evidence is conclusive that he (Jackson) was the principal, and obtained possession of the premises under a lease made to the Emanuel Jackson Undertaking Corporation with the purpose and intent that he, Daniel M. Jackson, should conduct therein a gambling house.'' It is undisputed that Jackson ''had strong political affiliations and ran political clubs in the ward.'' As soon as he took possession of the premises the entire place was furnished with all of the paraphernalia of a general gambling house and race track gambling establishment. In

June, 1924, Jackson took a lieutenant of police through the building, and the latter, a friend of Jackson, testified that he then found the place equipped as a gambling house; "he showed me the layout in June, 1924. There wasn't any gambling when I was there. He showed me how the place was fitted up. . . . I never caused his arrest." It is not disputed that Jackson never conducted an undertaking business in the premises and that there was nothing on the inside or outside of the place that would even suggest that such business was conducted therein. "There were two sets of doors" in connection with the front entrance. The second or inner one was "an iron door." In each door there was an opening or "peek hole." Between the two doors was a vestibule. Albert Warren, who was doorman from the time the place was opened until it closed in 1929, testified that when the outside bell rang he would look out through an opening in the outer door and if the person or persons on the outside were all right, "if they were not policemen," he would admit them to the vestibule and there search them and take away any weapons they might have, which would be restored to them when they left the premises; that as soon as he had completed the search he would notify "the lookout" behind the iron door that the party or parties were "all right" and the lookout, who also had a peekhole through which he could observe what was taking place in the vestibule, would then open the iron door and admit the party or parties to the gambling house; that he admitted, on an average, 200 or 300 persons a day; that as soon as a person passed the iron door he could "see the gambling going on." A woman who lived a few doors from the place testified that all day long you could see people going in and out of the place, and that she had seen as many as ten or twelve men go in at one time; that "every few minutes, or five or ten minutes you would see them

come in and going out. . . . That was during 1924, '25 and '26. . . . I think '27 too, well, all the time until they raided the club and closed it,'' in 1929; that she had seen the ''police go in, lots of times . . . but they didn't make any efforts to pull the place, as they call it''; that she ''saw police patrols there on different occasions. . . . One date I saw a police patrol, two or three of them coming there constantly until I counted eleven or thirteen of them, I am not sure which, . . . and they took axes and cut their way in the back of the place, and then we went in the front to watch the policemen take the people out, and they took eleven or thirteen loads, I don't remember which''; that she had seen the police wagons there several other times; that she had seen police go in the place ''any number of times.'' A number of police officers testified that they went to the place at different times but did not ''pull it,'' because after they gained admittance they did not find anyone actually gambling. Notwithstanding that complaints were made to the police stations as to the nature of the business conducted in the premises, and that many members of the police department knew the character of the place, it appears that during the lifetime of Jackson inmates of the place were arrested but once, although the undisputed evidence shows that it was a matter of common knowledge in the vicinity of the premises that they were used as a gambling house, where hundreds of patrons went daily to bet on horse races and to play games of chance for money. The one occasion referred to was in 1926, when the police raided the place and arrested 35 men and took them to the police station, and although Jackson unlocked the front door and admitted the police to the premises and gave every indication that he was running the place, he was not arrested. The men arrested were discharged. In 1929, after the death of Jackson, the police again raided

the place. They gained admittance to the vestibule between the outer door and the iron door and then announced themselves as police officers and ordered the iron door to be opened. The lookout man behind that door knew the officer in command and refused to open it. The police then broke down the iron door and found inside 75 or 100 men trying to escape through windows and doors. The officer in command testified that he made no arrests on this occasion. There was another raid in October, 1929, when the police broke down the front door and the iron one, with axes, and arrested from 150 to 170 people who were gambling, and it required 12 or 15 patrol wagons to take the prisoners to the police station.

As the claimants now admit that Jackson conducted a gambling house in the premises from June, 1924, until his death, we have made the aforesaid somewhat lengthy statement as to the character of the place and the happenings there because it bears upon the question as to the good faith of the claimants when they made the lease and their knowledge of the use made by Jackson of the premises. The claimants required Jackson to guarantee the payment of the rent and also the performance of the covenants of the lease, and they state that he was "the owner and keeper" of the place. The proof is overwhelming that he was well known in the vicinity as a professional gambler and the operator of gambling resorts, and it must be presumed that the claimants made some inquiries as to the guarantor before they signed a lease for a term of 10 years. They also owned other pieces of property in the neighborhood and their real estate agents had an office but a very short distance from 3441. Harper testified that these agents collected the rents and looked after the insurance, and "the fulfilling of the lease" in question; that he (Harper) transacted his banking business with the Franklin bank, located on the corner of

Michigan avenue and 35th street, but a few feet south
of 3441; that his business with the bank took him
there "every week or it might be twice a week. It
might be only once in two weeks . . . anywhere
from three to half a dozen times a month"; that when
he was in the neighborhood of 3441 he "would walk
around and just kind of look things over, but I
wouldn't go and request to go in"; that the place "did
not look like an undertaking establishment"; that
there was a brass sign on the right hand side of the
door with the words "Dunbar Club" on it; that
"Daniel Jackson or the funeral company or the occu-
pants, called up and told me they had accidentally
opened one or two of the letters (addressed to Harper)
by mistake"; that upon three occasions he rang the
front door bell and was admitted to the vestibule by
a colored man and that on each occasion he told the
man that he was William E. Harper, the landlord,
and that he had been told that there were some letters
for him that had been directed to that address; that
the doorman did not admit him through the second
door, and he "was not allowed to see the interior";
that the doorman would bring back the letters and
deliver them to him in the vestibule; that he never at
any time made any effort to go inside the premises or
to ascertain what business was being conducted there-
in. "Q. Weren't you interested in knowing what
they were going to use it for? A. No, sir, the lease
had been signed and I didn't feel I was concerned any-
more, because sooner or later, whether important or
not, that was the purpose for which it would be used.
I had absolute faith in them. . . . Q. Did you ever
make any inquiry as to what they were running in
there? A. No, sir. Q. Were you interested in it?
A. No, I depended upon the wrongdoing to be re-
ported to me. Q. By whom? A. By anybody; the
real estate agent or any other person." The witness

further testified that he did not ask to go inside because he thought that if he was welcome they would invite him in; that prior to October, 1929, his attention was never called to the fact that there was reputed to be gambling at 3441 Michigan avenue, and that he never heard a complaint from any source that gambling was conducted in the place. "Q. Prior to October of 1929 did you ever have your attention called to the fact that there was reputed to be gambling at 3441? A. No, I had no *direct knowledge* of that"; that after he heard of the raid in October, 1929, he went to his real estate agent and told him if those arrested in the raid *were convicted in court,* he "wanted immediate steps taken for their vacating the property, to stop the gambling," and that he ascertained later that they were not convicted. There was a provision in the lease that gave him the right to have free access to the premises "for the purpose of examining or exhibiting the same, or to make any needful repairs or alterations of said premises which said first party may see fit to make," but he testified that from the time that Jackson took possession until months after the death of the latter he never saw the inside of the premises, nor did he at any time make any inquiry of anybody. as to what business was being conducted therein. After the death of Jackson he received rent from somebody until October, 1929. Gambling continued in the premises until October, when the police not only raided the place but appear to have gutted it. Jackson was dead. Gambling ceased and the place was abandoned. The payment of rent also ceased, and then, for the first time, Harper, according to his testimony, visited the place. Warren, the doorman, testified that on two occasions, possibly three, Harper came to the door of the place and that as the latter was a white man he could not admit him without the O. K. of Jackson; that he notified the man on the inside that Harper wished

to see Jackson and the latter ordered Warren to admit Harper to the place and that Harper then went through the iron door into the gambling house, and the witness saw him meet Jackson; that gambling was going on during Harper's visits. Harper, in rebuttal, testified that the doorman would not let him go beyond the vestibule. A witness who conducted a store a few doors from the place testified that he had known Harper for a number of years and that the latter frequently came to the store to buy cigars and fruit; that the Harper family dealt with him before they moved from 3441; that in 1925 and 1926 he told Harper, on two or three different occasions, that they were "running a big gambling joint" in 3441, and that raids had been made on the place; that upon each occasion Harper "didn't say a word, he kept quiet and looked out." Harper did not specifically contradict this testimony of the storekeeper. It appears that before an application for a license to conduct an undertaking establishment on a boulevard is granted there must be filed with the city a written consent of a majority of the property owners on both sides of the boulevard in the block in which such place of business is to be located, and it was proven that no such frontage consent was ever filed with the City of Chicago, that no application for a license to conduct an undertaking establishment at 3441 was ever filed with the city, and that no license to conduct such a business at 3441 was ever issued. Harper testified that he never gave Jackson a written "frontage consent" for an undertaking establishment in the premises, and that Jackson never asked him for such consent. During all of the period in question Emanuel Jackson Undertaking Corporation continued to conduct its business at 3400 Michigan avenue, *which is only 200 feet from 3441.* The lease provided that the lessee "will make, at his own cost and expense, all repairs of every kind, nature and description, both inside and outside of the buildings

on the premises herein described, including plumbing, heating, decorating, roofing . . . ,'' and as soon as Jackson took possession of the building he made many very material changes in the interior of the same; but Harper, in spite of the fact that the tenant would not permit him to enter the premises and he could not tell from outside observation what was going on in the place, if his testimony is to be believed, never saw or requested to see the interior of the building.

When premises are rented by the lessee for gambling purposes, and this is known to the lessor, there can be no recovery for rent. (*Harris v. McDonald,* 79 Ill. App. 638 (affirmed, 194 Ill. 75), and cases cited therein; *Fields v. Brown,* 188 Ill. 111; *White v. Holden,* 206 Ill. App. 567.) Neither can he in such case recover against the guarantor. It is sufficient to say as to several cases cited by the claimants, that they merely hold that the proof must show that the landlord knew about the improper use of the premises, or that he knew when he executed the lease that the premises were to be used for gambling purposes.

The claimants argue that the lease specifically provides that the premises shall not be used for any illegal purpose, and that there is no evidence that the claimants and Jackson had any understanding that the premises were to be used for gambling purposes. An illegal agreement may be tacit as well as express, and its existence may be established by proof of facts and circumstances showing coincidences which can be accounted for upon no other assumption than that such an original understanding existed. (*Estate of Ramsay v. Whitbeck,* 183 Ill. 550.) In that case the court said (p. 562): ''It is not necessary that the understanding should be established by something that was said, but it may be arrived at from all the circumstances, in the light of experience and common observation.'' In the instant case, not only the printed part of the lease, but the typewritten part thereof

provided that the premises should be used for only lawful purposes. This circumstance is not without some weight as tending to prove that the claimants intended to provide themselves in advance with a means of escape should the charge be brought against them that they rented the premises for a gambling house. (*People v. Viskniskki,* 255 Ill. 384, 388.) It has been held that in an action for rent, evidence of the reputation of a house as one of ill fame is admissible on the part of defendant to show that it was so used with the owner's knowledge, and that the contract was illegal. (See *Demartini v. Anderson,* 127 Cal. 33, 59 Pac. 207, wherein many cases are cited in support of the holding. See also *Graeter v. State,* 105 Ind. 271.) It is, of course, the law that the intent with which the lease was made, or knowledge that the place was being conducted as a gambling house, may be shown by direct and circumstantial evidence. It would be contrary to human experience and common knowledge to hold that the events that we have recited could have happened without the consent and knowledge of the claimants. After a careful consideration of all the facts and circumstances we have reached the conclusion that the premises were rented by the claimants for gambling purposes and that they knew during the entire period that the lessees occupied the premises that they were being used for gambling purposes. Under such a state of facts the claimants cannot recover under the lease.

The judgment of the circuit court of Cook county is reversed with a finding of facts, and judgment will be entered in this court for the estate for costs.

*Reversed with a finding of facts and judgment here.*

KERNER, P. J., and GRIDLEY, J., concur.

Finding of facts: We find as ultimate facts that the estate of Daniel M. Jackson, deceased, is not indebted to the claimants in the amount alleged in the claim

nor any part thereof; and we further find that the claimants leased the premises in question for gambling purposes and that they knew during the entire period that the lessees occupied the premises that they were being used for gambling purposes.