2015 IL App (2d) 150013
No. 2-15-0013
Opinion filed December 10, 2015
Modified upon denial of rehearing February 10, 2016

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE CITY OF ELGIN, | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12-MR-53 |
| | ) | |
| ARCH INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| (Fidelity and Deposit Company of Maryland, | ) | |
| Defendant and Counterplaintiff-Appellant; | ) | Honorable |
| TRG Venture Two, LLC, Defendant and | ) | David R. Akemann, |
| Counterdefendant-Appellee). | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Burke and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1    This case grows out of the real estate crash of 2008.  In 2003, the plaintiff, the City of

Elgin (City), entered into an agreement with a developer, Kimball Hill, Inc., whereby Kimball

Hill agreed to develop certain property as a residential planned development and to make various

improvements to the property (including sewers, water lines, and streets) at its own expense, and

the City approved the development and agreed that it would annex the property into the City

(Annexation Agreement).  Kimball Hill obtained bonds guaranteeing its performance under the

Annexation Agreement from two of the defendants, Arch Insurance Company (Arch) and

Fidelity and Deposit Company of Maryland (Fidelity). After selling some homes as improved parcels, Kimball Hill went bankrupt. The remaining property was sold in bankruptcy to the defendant TRG Venture Two, LLC (TRG). After TRG refused the City's demands that it complete the improvements required by the Annexation Agreement, the City sued TRG, Arch, and Fidelity. Fidelity filed a counterclaim against TRG essentially alleging that TRG should be held primarily liable for the improvements and that Fidelity was entitled to indemnification or reimbursement to the extent that Fidelity was held liable to the City. The trial court dismissed the counterclaim for failure to state a claim upon which relief could be granted. After all of the other claims were settled or resolved, Fidelity appealed this dismissal. We affirm in part and reverse in part, and remand.

¶ 2                                    BACKGROUND

¶ 3     The following facts are drawn from the allegations of the complaint and counterclaim, and the exhibits thereto. In reviewing the grant of a motion to dismiss brought pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2012)), we take all well-pled allegations as true. *Kanerva v. Weems*, 2014 IL 115811, ¶ 33. In July 2003, the City and Kimball Hill entered into the Annexation Agreement. Kimball Hill was identified in the agreement as the "Owner" or "Developer." In it, Kimball Hill undertook to (among other things) construct the public improvements necessary to serve the development, including the storm and sanitary sewers, water mains, and streets. The Annexation Agreement had a term of 20 years, and expressly (and repeatedly) stated that the obligations under the agreement constituted covenants that would run with the land, and that the agreement would be binding on any successors and assigns of "all or any part of" the property, as well as on any "successors in title of the Developer." Paragraph 45 of the Annexation Agreement also stated that the sale or conveyance of any portion of the property during the 20-year term would release the Developer

- 2 -

from all obligations and responsibilities relating to the sold or conveyed portion, and that those obligations and responsibilities would be assumed by the purchaser or grantee.

¶ 4    Under the Annexation Agreement, Kimball Hill was required to obtain bonds guaranteeing its performance.  It obtained those bonds from Arch and Fidelity.  Between July 2004 and December 2005, Fidelity issued six bonds securing the performance of various aspects of the work in the total amount of approximately $1.4 million.  The bonds identified Kimball Hill as the principal obligor with the duty to perform and the City as the obligee (the entity to which the funds would be paid in the event of nonperformance).  Each bond stated that, "WHEREAS, the City of Elgin's approval of that development is conditioned upon the completion of the following improvements within that development," unless the principal obligor "construct[ed] the improvements herein described and [paid] the cost of such construction, *** and [saved] the Obligee harmless from any loss cost or damage by reason of its failure to complete said work," then Fidelity would either complete the improvements itself or pay the City the cost of those improvements, up to the amount of the bond.

¶ 5    In April 2008, Kimball Hill went bankrupt.  At that point, a number of homes had been built and had been sold to individual homeowners in four of the six "neighborhoods" of the development.  The other two neighborhoods were still unplatted and unimproved.  Overall, in the words of the trial court, "significant outstanding improvements remain[ed] unfinished."  In 2010, TRG bought Kimball Hill's interest in the development, including the two vacant unplatted neighborhoods and 174 vacant homesites and 8 "outlots" in the partially-developed neighborhoods, from a trust that handled the bankruptcy estate.  Thereafter, TRG refused to make the remaining improvements required under the Annexation Agreement.

¶ 6    In January 2012, the City sued TRG, Arch, and Fidelity.  The City alleged that, as the successor to Kimball Hill under the Annexation Agreement, TRG was responsible for

completing the improvements, and that, to the extent that TRG was unwilling or unable to do so, the two sureties were liable on the bonds they had issued.

¶ 7    Fidelity filed an answer and affirmative defenses, and also filed a three-count counterclaim. Count I was titled "Repayment/Reimbursement/Indemnity," and alleged that TRG was primarily responsible for completing the improvements under the Annexation Agreement, while Fidelity was only secondarily liable. Because this performance was the matter guaranteed by the bonds, Fidelity asserted that TRG had a "common law and implied contractual duty to repay and reimburse" any amounts Fidelity was required to pay on the bonds as well as any costs Fidelity incurred in defending itself. Count II was titled "exoneration" and asserted that, as "*de facto* principal" on the bonds, TRG had stepped into the shoes of Kimball Hill and owed Fidelity a duty under the bonds to protect Fidelity from loss. Count III, titled "*Quia Timet*," sought to require TRG to deposit collateral with Fidelity in an amount sufficient to protect Fidelity from any loss.

¶ 8    Following some initial discovery, all of the parties filed various dispositive motions. As relevant here, the City filed a motion for partial summary judgment against each defendant, seeking a declaration of liability. Fidelity filed a motion for summary judgment against the City and TRG on its first affirmative defense, arguing that the sale of the property to TRG had discharged Kimball Hill's liability under the Annexation Agreement and therefore discharged Fidelity's obligations under the bonds. TRG filed two motions to dismiss the City's complaint pursuant to section 2-615 of the Code: the first argued that TRG had no obligations under the Annexation Agreement, while the second argued separately that the City had failed to join all necessary parties by failing to join the individual homeowners who had purchased lots in the development.

¶ 9    On December 4, 2013, the trial court issued a memorandum order regarding the motions that had been filed. It first held that the Annexation Agreement constituted a covenant running with the land, and thus its validity was not impaired by Kimball Hill's bankruptcy. However, the Annexation Agreement had been discharged as to Kimball Hill by Kimball Hill's sale of its remaining property to TRG. The sureties, Arch and Fidelity, argued that this discharge of Kimball Hill also operated to discharge their duties, because the liability of a surety arises from the same conduct as the liability of the principal, and the release of the principal also releases the surety. The trial court agreed, finding that the Annexation Agreement did not contain any reservation of rights through which the City could enforce the agreement against the sureties even after the discharge of the principal. Thus, the City could not proceed against Arch and Fidelity under the Annexation Agreement.

¶ 10    However, the trial court then held that the City could seek payment from Arch and Fidelity under the bonds they had issued, because those bonds constituted contracts separate from the Annexation Agreement. In so holding, the trial court adopted the City's argument along the following lines. In December 2003, Kimball Hill purportedly conveyed its interest in the development to "Waterford Limited Partnership." (Kimball Hill was the general partner of this limited partnership, which was one of the affiliated entities involved in the Kimball Hill bankruptcy in 2008.) A warranty deed for the conveyance was recorded on January 14, 2004. Because the Annexation Agreement provided that the sale of the development property discharged Kimball Hill's obligations and imposed those obligations on the purchaser, the trial court reasoned that Kimball Hill owed no further performance under the Annexation Agreement after January 2004. Nevertheless, the sureties issued bonds guaranteeing Kimball Hill's performance, all of which were issued after that date. Further, the bonds did not expressly refer to the Annexation Agreement. Thus, the trial court held, the bonds represented new contracts

that were separate from the Annexation Agreement, and the City could seek payment under the bonds even if Kimball Hill, Arch, and Fidelity were not obligated under the Annexation Agreement.

¶ 11    On the basis of this holding, the trial court denied the sureties' dispositive motions and granted the City's motion for partial summary judgment as to the sureties' liability under the bonds. Fidelity, the appellant here, has not appealed from this order.

¶ 12    As to TRG's liability to the City, the trial court held that the Annexation Agreement bound TRG as a subsequent purchaser of land within the development, and TRG was subject to the terms and obligations of the Annexation Agreement. Nevertheless, the trial court granted TRG's motions to dismiss the City's complaint against TRG. The trial court's sole comment relating to this dismissal was that not "all of those in the same situation" as TRG were joined as parties. Presumably, this comment indicated that the trial court believed that the individuals who had purchased homes in the development were indispensable parties to the suit. However, the trial court did not elaborate on its reasoning for this conclusion.

¶ 13    Shortly after the trial court issued its December 2013 order, Fidelity filed an amended counterclaim against TRG, adding a fourth count alleging unjust enrichment. TRG moved to dismiss the amended counterclaim pursuant to section 2-615 of the Code, arguing that the counterclaim should be dismissed for failure to name all necessary parties (the individual homeowners who purchased improved lots) and that TRG could not be liable to Fidelity on the bonds, because it was not a party to the bonds and had no relationship to Fidelity. On May 29, 2014, the trial court granted TRG's motion and dismissed the counterclaim with prejudice. The record does not contain any insight into the trial court's rationale.

¶ 14    The case proceeded to trial in September 2014. The City settled its claim against Arch in October, and later reached a settlement with Fidelity as well. In December, the trial court

entered an agreed dismissal order in which the City voluntarily nonsuited its claims against TRG and TRG retained all rights and defenses, thereby disposing of all remaining issues. Fidelity filed a notice of appeal from the trial court's order of May 29, 2014, dismissing Fidelity's counterclaim.

¶ 15                                      ANALYSIS

¶ 16    Fidelity asserts that the trial court erred in dismissing Fidelity's counterclaim against TRG pursuant to section 2-615 of the Code.

> "In ruling on a section 2-615 motion to dismiss, the court must accept as true all well-pleaded facts in the complaint and all reasonable inferences which can be drawn therefrom. [Citations.]  In making this determination, the court is to interpret the allegations of the complaint in the light most favorable to the plaintiff. [Citation.]  The question presented by a motion to dismiss a complaint for failure to state a cause of action is whether sufficient facts are contained in the pleadings which, if established, could entitle the plaintiff to relief. [Citation.]  A cause of action should not be dismissed on the pleadings unless it clearly appears that no set of facts can be proved under the pleadings which will entitle the plaintiff to recover."  *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 86-87 (1996).

We review *de novo* the dismissal of a complaint pursuant to section 2-615.  *Wallace v. Smyth*, 203 Ill. 2d 441, 447 (2002).

¶ 17                          A. Sufficiency of the Complaint

¶ 18    TRG argues that none of the claims asserted in Fidelity's counterclaim states a valid cause of action because there is no contractual relationship between TRG and Fidelity: even assuming that TRG is a successor to Kimball Hill and is bound to perform Kimball Hill's obligations under the Annexation Agreement, Fidelity is not a party to the Annexation

Agreement, and TRG is not a party to the bonds. TRG points to the trial court's finding that the bonds imposed obligations on the sureties that were separate from Kimball Hill's obligations under the Annexation Agreement. Accordingly, TRG argues, there is no basis upon which it can be liable *to Fidelity* for TRG's putative breach of the Annexation Agreement.

¶ 19    This argument misunderstands the law of surety and guaranty.[1] A surety relationship arises when one agrees to assume liability for the payment of another's debt or the performance of another's obligations under a contract. See Black's Law Dictionary 1456 (7th ed. 1999); Restatement (Third) of Suretyship and Guaranty (hereinafter, Restatement) § 1 (1996); see also *Mercantile Holdings, Inc. v. Keeshin*, 187 Ill. App. 3d 1088, 1094 (1989) (surety relationship may arise by operation of law). A surety is a secondary obligor whose liability is collateral to that of the principal obligor. *Chandler v. Maxwell Manor Nursing Home, Inc.*, 281 Ill. App. 3d 309, 323 (1996) ("The surety's obligation, wherein he agrees to be answerable for the debt or obligation of another, is not an original and direct obligation for the performance of his own act, but rather is an accessorial obligation to the obligation contracted by the principal.).") "As a general rule, the liability of a surety is measured by the liability of its principal." *Village of Rosemont v. Lentin Lumber Co.*, 144 Ill. App. 3d 651, 668 (1986). Because the surety is bound to perform if the principal obligor does not, the surety has the right to compel the principal obligor to either perform its obligation or pay the costs that accrue to the surety because of the principal obligor's nonperformance. *Estate of Ramsay v. Whitbeck*, 183 Ill. 550, 567 (1900)

---

[1] For ease of reference, we refer herein to both of these as "suretyship," but see *JPMorgan Chase Bank, N.A. v. Earth Foods, Inc.*, 238 Ill. 2d 455, 474 (2010) (explaining the difference between a surety and a guarantor). Strictly speaking, Fidelity is a guarantor, but as the parties and trial court all refer to it as a surety, we do so as well.

("When a surety signs a bond the law raises an implied promise by the principal to reimburse the surety for any loss which he may sustain ***."); Restatement § 21. Thus, although both the surety and the principal obligor may be liable to the "obligee" (the party to whom the principal obligor owes the obligation to perform), "as between the principal obligor and the secondary obligor, it is the principal obligor who ought to perform the underlying obligation or bear the cost of performance." Restatement § 1(1)(c).

¶ 20    In this case, the initial principal obligor was Kimball Hill, which entered into the Annexation Agreement with the City. Under that agreement, Kimball Hill agreed to, among other things, construct the public improvements at issue here ("the underlying obligation"). The Annexation Agreement also required, as a condition to the City's performance, that Kimball Hill obtain bonds guaranteeing its own performance of the underlying obligation. Kimball Hill entered into bond agreements with Fidelity (the surety or secondary obligor). Those bonds expressly benefited both Kimball Hill, by fulfilling one of the conditions to the City's performance under the Annexation Agreement, and also the City (the obligee), which received a guarantee of Kimball Hill's performance. As the bonds state, Fidelity's liability to the City derived from Kimball Hill's obligations; Fidelity would not be liable to the City unless Kimball Hill failed to perform.

¶ 21    The trial court held that, when Kimball Hill's bankruptcy trust sold all of the remaining property in the development to TRG, the sale discharged Kimball Hill's obligation to complete the public improvements. However, that underlying obligation was a covenant that ran with the land and thus bound TRG. Although TRG has reserved its right to contest this holding in the context of the City's claim against TRG, we accept it for the purposes of analyzing the sufficiency of Fidelity's counterclaim. The Annexation Agreement, which was recorded shortly after it was entered into, clearly provides that any subsequent development of the property must

comply with the terms therein. The agreement provides that it is binding on successors and assigns and that its terms constitute a covenant running with the land. Moreover, state law likewise provides that annexation agreements "shall be binding upon the successor owners of record of the land which is the subject of the agreement." 65 ILCS 5/11-15.1-4 (West 2012). On the record before us, TRG's successor liability would appear to be a matter of public record and statutory law, which is incorporated into every contract unless the contract provides to the contrary. *Schiro v. W.E. Gould & Co.*, 18 Ill. 2d 538, 544-45 (1960). Nevertheless, as the issue is not before us, we make no final determination of that liability.

¶ 22 In its counterclaim, Fidelity alleges that TRG assumed Kimball Hill's obligations under the Annexation Agreement and is now the "principal obligor" that must perform the underlying obligation. Thus, under the principles of suretyship, to the extent that Fidelity is not released from its surety obligations, Fidelity is entitled to look to TRG to either perform TRG's obligations under the Annexation Agreement or pay the costs sustained by Fidelity if it is forced to pay the City because of TRG's failure to perform. *Estate of Ramsay*, 183 Ill. at 567; Restatement § 21. Where, as here, the suretyship relationship arises by operation of law, the mere fact that the successor principal is not in direct contractual privity with the surety will not defeat the claim. See *Keeshin*, 187 Ill. App. 3d at 1091-92 (where third parties assumed the former principal's obligation for a debt, they became primarily liable for that debt and a surety who was harmed by their failure to pay the debt could seek recourse against them). Thus, Fidelity's counterclaim is not fatally deficient as a matter of law.

¶ 23 TRG points out that the trial court determined that the Annexation Agreement and the bonds were separate contracts, and argues that Fidelity has no standing to enforce TRG's obligations under the Annexation Agreement, because Fidelity is not a party to that agreement. We think that the trial court erred in reading *Lake View Trust & Savings Bank v. Filmore*

*Construction Co.*, 74 Ill. App. 3d 755, 757 (1979), as holding that an underlying contract may not be read together with a security bond unless the bond expressly refers to that contract. To the contrary, *Lake View* stated that "[s]trong authority supports the proposition that a *** bond and the contract it secures must be read as one instrument." *Id.* The *Lake View* court then went on to note that, when the bond expressly incorporates the underlying contract by reference (as was the case there), the terms of the underlying contract could supply the meaning of the language of the bond. *Id.* However, even where the bond does not expressly refer to or incorporate the underlying contract, the two documents may still be read together to determine the intent of the contracting parties. *Pecora v. Szabo*, 94 Ill. App. 3d 57, 63 (1981) (where different instruments are executed as part of the same transaction, they may be read together; "doctrine of collateral contract is not limited in application to documents which refer to each other"); *Fisher v. United States Fidelity & Guaranty Co.*, 313 Ill. App. 66, 74 (1942) (where the purpose of construction contract that was secured by surety bond was to construct a building particularly fit for the use provided in a lease, all of those documents—the contract, the bond, and the earlier lease—must be construed together).[2]

---

[2] The trial court also relied upon the purported transfer of Kimball Hill's rights in the development to Waterford LLP in January 2004 (after the execution of the Annexation Agreement but before the issuance of any of the bonds), reasoning that this transfer released Kimball Hill from all of its obligations under the Annexation Agreement pursuant to the language in paragraph 45 of that agreement and that therefore the bonds must represent "new" obligations unrelated to the Annexation Agreement. TRG has not argued this point in urging affirmance, however, and thus we need not consider it. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013). Further, in its answer Fidelity alleged that the January 2004 transfer was of no legal

¶ 24    Here, there is no doubt that the obligations secured by the bonds arose out of the Annexation Agreement, even if that agreement was not specifically mentioned in the bonds. *City of O'Fallon v. Bank of Belleville*, 171 Ill. App. 3d 584, 586 (1988).  The fact that the bonds were executed several months after the Annexation Agreement is of no moment, as that agreement expressly contemplated that the bonds would be obtained at a later date, providing that "[a]dequate security as provided by law shall also be furnished by Developer."  Further, the bonds were obtained in order to fulfill a requirement imposed under the Annexation Agreement and they conferred a direct benefit upon both the City and the party bound to perform under that agreement—now, TRG.  Finally, as noted above, a surety relationship may arise by operation of law even where there is no direct contractual relation between the principal and the surety.  For all of these reasons, the facts that Fidelity is not a party to the Annexation Agreement and that TRG did not execute the bonds do not defeat the causes of action asserted in Fidelity's counterclaim.

¶ 25    TRG next attacks the sufficiency of each count of the counterclaim individually.  We agree with TRG that counts II and III of the counterclaim are moot due to the current posture of the case.  Count II, "exoneration," sought to compel TRG to perform its obligations under the Annexation Agreement before Fidelity had to perform.  However, Fidelity has now settled the City's claims against it (and that settlement has not been challenged), while the City's claims against TRG have been settled pursuant to a reservation of rights.  Accordingly, the relief sought

significance because Kimball Hill subsequently reaffirmed its obligations under the Annexation Agreement by performing those obligations.  Lastly, we note that Kimball Hill itself appeared to treat the transfer as either ineffective or revoked, given that it obtained the bonds in its own name and proceeded with the partial development of the property under the Annexation Agreement.

by Fidelity cannot be granted by this court and count II is now moot. See *In re Marriage of Eckersall*, 2015 IL 117922, ¶ 9. Similarly, count III, "*quia timet*," sought to compel TRG to deposit with Fidelity collateral sufficient to protect Fidelity's potential liability until such time as that liability was determined. Due to Fidelity's settlement with the City, this count too is moot. We therefore address the sufficiency of Fidelity's complaint only as to counts I (indemnity/reimbursement) and IV (unjust enrichment).

¶ 26    We begin by addressing Fidelity's implied-indemnity claim.

"Indemnity is a common law doctrine which shifts the entire responsibility from the party who has been compelled to pay the plaintiff's loss to another who actually was at fault. [Citation.] The right to indemnity may be express, as in a contractual provision, or may be implied in law, arising in situations in which a promise to indemnify can be implied from the relationship between the parties." *Kerschner v. Weiss & Co.*, 282 Ill. App. 3d 497, 502 (1996).

¶ 27    TRG argues that Fidelity did not plead any cognizable theory of express or implied indemnity, because there was no contractual basis for indemnity and TRG has no other relationship with Fidelity. However, we have already rejected these arguments insofar as they relate to implied indemnity. As stated above, because TRG assumed Kimball Hill's obligations under the Annexation Agreement and those obligations were the basis for the surety bonds, a suretyship relation arose as a matter of law, and TRG owes Fidelity a common-law duty to perform its obligations and to hold Fidelity harmless from its failure to do so. *Estate of Ramsay*, 183 Ill. at 567; *Keeshin*, 187 Ill. App. 3d at 1091-92. TRG cites *Talandis Construction Corp. v. Illinois Building Authority*, 23 Ill. App. 3d 929, 935 (1974), for the proposition that "a stranger to a contract between two parties cannot be compelled to indemnify one of the parties for breach of contract absent the stranger's express agreement" to do so. Here, however, TRG is not a stranger

to the bonds upon which the City sued Fidelity. Rather, TRG's underlying obligation to the City (which arose when TRG bought the remaining property in the development) is itself the subject matter of those bonds. As noted by our supreme court over a century ago, "[w]hen a surety signs a bond, the law raises an implied promise by the principal to reimburse the surety for any loss which he may sustain." *Estate of Ramsay*, 183 Ill. at 567. Accordingly, the trial court erred in dismissing count I of Fidelity's counterclaim, the claim for indemnity/reimbursement.

¶ 28    We therefore turn to count IV, Fidelity's claim of unjust enrichment. To plead a cause of action for unjust enrichment, a plaintiff must allege facts that would support "the conclusion that it conferred a benefit upon the defendant which the defendant has unjustly retained in violation of fundamental principles of equity and good conscience." *Karen Stavins Enterprises, Inc. v. Community College District No. 508*, 2015 IL App (1st) 150356, ¶ 7. "Stated otherwise, *** a plaintiff must show that it has furnished" something of value "which the defendant received under circumstances that would make it unjust to retain without paying a reasonable value therefore [*sic*]." *Id.*

¶ 29    Here, Fidelity alleged that TRG was the primary obligor bound to perform the underlying obligation under the Annexation Agreement that is secured by the bonds issued by Fidelity; that the City sought payment from Fidelity because TRG did not perform that obligation; that any recovery the City receives from Fidelity must, under law, be used to make the public improvements required under the Annexation Agreement; that TRG, as the landowner, will be benefited by those improvements; and that it would be unjust for TRG to retain this benefit when its own wrongful failure to perform the underlying obligation gave rise to Fidelity's liability.

¶ 30    TRG first argues that it owes Fidelity no duty and that therefore no unjust-enrichment claim can be alleged, but as we have held, this argument lacks merit. TRG next argues that Fidelity had a contractual obligation to perform under the bonds and thus cannot assert an unjust-

enrichment claim against one who was not a party to those bonds. In support, TRG cites *Hayes Mechanical, Inc. v. First Industrial, L.P.*, 351 Ill. App. 3d 1 (2004), and *Daley v. G'Sell*, 102 Ill. App. 3d 548 (1981). However, neither of those cases involved a surety relationship between the plaintiff and defendant, and in neither case did the costs sustained by the plaintiff arise from the defendant's default of its own obligations. Thus, they are inapposite, and this argument too lacks merit.

¶ 31    Lastly, TRG argues that where, as here, the benefit is not directly conferred by the plaintiff but instead is received from a third party, the plaintiff must allege that "(1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead [citation], (2) the defendant procured the benefit from the third party through some type of wrongful conduct [citation], or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant [citation]." *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 161-62 (1989). Contrary to TRG's argument, however, Fidelity's counterclaim meets this standard—it alleges that TRG obtained the benefit of the improvements through wrongful conduct (refusing to perform its obligations under the Annexation Agreement), thereby meeting the second test. The counterclaim also alleges that Fidelity had a better claim to the benefit (the cost of the improvements) than TRG, because TRG had the primary obligation to perform under the Annexation Agreement, while Fidelity's obligation was secondary. Accordingly, we reject this argument as well.

¶ 32    For all of the foregoing reasons, we find that counts I and IV of Fidelity's counterclaim were sufficiently pled. To the extent that the trial court found to the contrary, it erred.

¶ 33                                B. Necessary Parties

¶ 34    We next discuss TRG's argument that the trial court properly dismissed the counterclaim pursuant to section 2-615 of the Code because Fidelity did not name all necessary parties—it did

not name as counterdefendants those individual homeowners who had bought homes in the development. A necessary party is "an individual or entity having a present, substantial interest in the matter being litigated, and in whose absence a complete resolution of a matter in controversy cannot be achieved without affecting that interest." *Cameron v. Bartels*, 214 Ill. App. 3d 69, 75-76 (1991). The interest of the necessary party must be "present and substantial rather than a mere expectance or future contingency." *Borrowman v. Howland*, 119 Ill. App. 3d 493, 499 (1983). A party is necessary if its participation "is required to (1) protect its interest in the subject matter of the controversy which would be materially affected by a judgment entered in its absence; (2) reach a decision protecting the interests of the parties already before the court; or (3) allow the court to completely resolve the controversy." *Zurich Insurance Co. v. Baxter International, Inc.*, 275 Ill. App. 3d 30, 37 (1995).

¶ 35 TRG argues that there are individual homeowners who purchased their homes from Kimball Hill who would also be liable under the legal theories asserted by Fidelity in its counterclaim, and that the joinder of these individual homeowners is necessary and the litigation may not proceed without them. Before analyzing the correctness of this argument, however, we must address a preliminary matter: the proper scope of section 2-615 in asserting a necessary-party argument.

¶ 36 A motion to dismiss brought under section 2-615 of the Code attacks the sufficiency of the complaint, on the basis that, even assuming the allegations of the complaint to be true and reading those allegations in the light most favorable to the plaintiff, the complaint does not state a cause of action that would entitle the plaintiff to relief. 735 ILCS 5/2-615 (West 2012); *Vitro v. Mihelcic*, 209 Ill. 2d 76, 81 (2004). Thus, dismissal under section 2-615 is warranted only when the facts alleged do not constitute a cognizable claim, or when the facts alleged show

conclusively that, as a legal matter, the plaintiff has no right to recover from the defendant. *Bryson*, 174 Ill. 2d at 86-87.

¶ 37    The language of section 2-615(a) explicitly refers to necessary parties in describing the relief available through motions brought under that section:

> "The motion shall point out specifically the defects complained of, and shall ask for appropriate relief, such as: that a pleading or portion thereof be stricken because substantially insufficient in law, or that the action be dismissed, or that a pleading be made more definite and certain in a specified particular, or that designated immaterial matter be stricken out, or that necessary parties be added, or that designated misjoined parties be dismissed, and so forth." 735 ILCS 5/2-615(a) (West 2012).

Thus, a motion objecting to a complaint on the ground that it fails to name all necessary parties may be brought pursuant to section 2-615, and the adding of necessary parties is one remedy available under that section.

¶ 38    Here, however, TRG did not seek the addition of other parties to the counterclaim, it sought the dismissal of the counterclaim. In determining whether dismissal under section 2-615 is appropriate, a court is limited to the face of the complaint; facts not appearing therein may not be considered. *Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶ 56. Thus, dismissal under section 2-615 for failure to join all necessary parties is warranted only when the existence of indispensable unnamed persons or entities appears on the face of the complaint.[3]

---

[3] As an aside, we recognize that a party may raise a necessary-party argument outside the context of section 2-615, such as through a motion to dismiss brought pursuant to section 2-619 of the Code (735 ILCS 5/2-619 (West 2012)). Indeed, proceeding under section 2-619 may be the appropriate course where the movant wishes to rely on matters outside the complaint itself.

¶ 39    That standard is not met here.  Although the counterclaim alleges that "TRG is the current owner of some or all" of the property in the development, which could perhaps be read as an allegation that other owners exist, the counterclaim does not allege any facts showing that any such owners are necessary parties.  As the alleged indispensability of other owners does not appear on the face of the counterclaim, it may not be considered in determining the sufficiency of the counterclaim.  *Id.*  Moreover, the causes of action pled in Fidelity's counterclaim do not show that the individual owners are necessary parties.  Fidelity asserts that TRG's liability for making the improvements flows, in part, from paragraph 45 of the Annexation Agreement.  That paragraph provides, in pertinent part:

> "in the event all or any portion of the [development] is sold or conveyed at any time during the terms of this Agreement, all of the obligations and responsibilities of the Developer deriving from this Agreement for the parcel sold or otherwise conveyed shall devolve upon and be assumed by such purchaser or grantee, and the Developer *** shall be released from all obligations of the Developer which relate to the sold portion of the [development] upon same being sold or conveyed."

---

*Id.* (a section 2-619 motion to dismiss asserts an affirmative defense or other matter which would defeat the plaintiff's claim); *Nielsen-Massey Vanillas v. City of Waukegan*, 276 Ill. App. 3d 146, 151 (1995).  Here, however, TRG has made clear that it seeks dismissal only under section 2-615, arguing repeatedly in its briefs that our analysis must be restricted to the allegations contained within the four corners of the counterclaim.  Further, Fidelity has had no opportunity to introduce its own "affirmative matter" on the necessary-party issue.  Accordingly, the only matter before us in this appeal is whether dismissal of the counterclaim for lack of necessary parties was proper under section 2-615.

TRG argues that, if this provision imposes upon TRG the duty to complete improvements as a result of TRG's purchase of all of the remaining property in the development, then it also imposes a similar obligation upon all of the other individuals who have bought homes in the development. Thus, it argues, the individual homeowners have a material interest in the outcome of Fidelity's claim against TRG, such that the litigation cannot proceed without them. (TRG also argues that it "cannot adequately protect its interests in this case in the absence of" the individual owners, because they may be liable for some portion of the relief sought from TRG. However, TRG's entire argument on this point consists only of this bare assertion, without elaboration or legal citation, and we thus find it forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013); *Mikolajczyk v. Ford Motor Co.*, 374 Ill. App. 3d 646, 677 (2007).)

¶ 40     TRG's argument is incorrect. Paragraph 45 does not impose a universal and unlimited obligation to make all improvements anywhere in the development upon anyone who purchased property in the development. Rather, it imposes upon purchasers the obligations "of the Developer *** for the parcel sold." Thus, the obligations imposed upon any particular purchaser depend upon the obligations of Kimball Hill that remain unsatisfied with respect to the specific "parcel sold." If these obligations have already been satisfied with respect to the parcel—as would be the case where Kimball Hill or some other entity had already completed the improvements at issue with respect to the homes that were sold—the individual purchasing homeowners would not be subject to any liability under paragraph 45. Accordingly, they would not have an interest requiring protection.

¶ 41     We clarify that we are not holding here that the individual homeowners are *not* necessary parties. The record does not currently contain an adequate basis for such a finding.[4] However,

---

[4] As noted above, before it moved to dismiss Fidelity's counterclaim, TRG filed a similar

the asserted indispensability of these parties does not appear on the face of the complaint, and thus dismissal under section 2-615 was not warranted. To the extent that the trial court based its dismissal of the counterclaim on TRG's argument that the individual homeowners were necessary parties who must be joined, it erred in doing so.[5]

---

motion to dismiss the City's claim against it for failure to join necessary parties (again, the individual homeowners). In its response brief, the City asserted that all of the public improvements in two of the six neighborhoods (Neighborhoods 3 and 6), and all of the public improvements adjacent to lots that were sold to individual homeowners in another neighborhood (Neighborhood 2), had been completed. Further, the only improvements still needed in Neighborhood 5 were certain "punch list items." Thus, according to the City, the only improvements for which it still sought to hold TRG liable were the improvements to Neighborhoods 1 and 4, which were wholly owned by TRG (and thus no individual homeowners would be liable for those improvements); the remaining improvements in Neighborhood 2, all of which were adjacent to the parcels owned by TRG; and certain "punch list items" in Neighborhood 5. However, the City's assertions in its brief were unsworn and were not supported by any affidavit, and Fidelity and TRG have not yet had the opportunity to present any evidence on this issue.

[5] TRG's final assertion in support of dismissal of the counterclaim is that Fidelity's efforts to hold it liable for the nonperformance of its obligations under the Annexation Agreement are somehow contrary to public policy. However, TRG never advanced this argument before the trial court, and thus it forfeited the ability to raise it on appeal. *Hytel Group, Inc. v. Butler*, 405 Ill. App. 3d 113, 127 (2010). TRG also fails to cite pertinent legal authority, another basis for forfeiture. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013); *Mikolajczyk*, 374 Ill. App.

¶ 42                                    CONCLUSION

¶ 43    For the foregoing reasons, the May 29, 2014, order of the circuit court of Kane County is affirmed as to counts II and III and reversed as to counts I and IV, and the cause is remanded for further proceedings consistent with this opinion.

¶ 44    Affirmed in part and reversed in part; cause remanded.

---

3d at 677.  (TRG's one citation—that the City's subdivision ordinance was enacted to "protect *** the public health, safety, and general welfare"—does nothing to advance TRG's specific argument here, and thus we do not consider it.)  Even if we were to consider the substance of TRG's argument, we would find that it lacks merit: nothing about Fidelity's pursuit of TRG as the principal obligor required to perform under the Annexation Agreement violates public policy.