NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

FILED
November 13, 2019
Carla Bender
4th District Appellate
Court, IL

2019 IL App (4th) 190389-U

NOS. 4-19-0389, 4-19-0390 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* I.L., a Minor | ) | Appeal from |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
|     Petitioner-Appellee, | ) | No. 17JA90 |
|     v. | ) | |
| Kenneth Q., | ) | |
|     Respondent-Appellant). | ) | |
| ———————————————————— | ) | |
| *In re* A.Q., a Minor | ) | |
| | ) | No. 17JA91 |
| (The People of the State of Illinois, | ) | |
|     Petitioner-Appellee, | ) | |
|     v. | ) | Honorable |
| Kenneth Q., | ) | Karen S. Tharp, |
|     Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices DeArmond and Harris concurred in the judgment.

**ORDER**

¶ 1     *Held*: The circuit court's finding respondent was unfit under section 1(D)(m)(ii) of
        the Adoption Act was not against the manifest weight of the evidence.

¶ 2     In September 2018, the State filed motions for the termination of the parental

rights of respondent, Kenneth Q., as to his minor children, I.L. (born in January 2017) and A.Q.

(born in November 2013). The State later filed amended termination motions. After a four-day

hearing, the Sangamon County circuit court found respondent unfit as alleged in the amended

termination motions. At a June 2019 hearing, the court found it was in the minor children's best

interests to terminate respondent's parental rights. Respondent appeals, asserting the circuit

court erred by finding him unfit. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4            I.L. and A.Q.'s mother is Brittany L., who filed her own appeal in case Nos. 4-19-0377 and 4-19-0378. In June 2017, the State filed petitions for the adjudication of wardship of the minor children, which alleged the minor children were neglected pursuant to section 2-3(1)(a) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a) (West 2016)). Specifically, the petition contended the minor children were not receiving the proper care and supervision necessary for their well-being, in that Brittany failed to a make a proper care plan for the minor children. At a November 2017 hearing, Brittany stipulated the minors were neglected as alleged in the petitions, and the circuit court adjudicated the minor children neglected. After a December 2017 hearing, the court found respondent and Brittany were both unfit, unable, or unwilling to care for the minor children, made the minor children wards of the court, and placed their custody and guardianship with the Department of Children and Family Services (DCFS).

¶ 5            In September 2018, the State filed motions to terminate respondent's and Brittany's parental rights to the minor children. The motions asserted respondent was unfit because he failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to the minor children's welfare (750 ILCS 50/1(D)(b) (West 2018)) and (2) make reasonable efforts to correct the conditions which were the basis for the removal of the minor children within nine months after the neglect adjudication, specifically November 8, 2017, to August 8, 2018 (750 ILCS 50/1(D)(m)(i) (West 2018)). The next month, the State filed amended motions for the termination of parental rights alleging respondent was unfit because he failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to the minor children's welfare (750

ILCS 50/1(D)(b) (West 2018)); (2) make reasonable efforts to correct the conditions which were the basis for the removal of the minor children within nine months after the neglect adjudication, specifically November 8, 2017, to August 8, 2018 (750 ILCS 50/1(D)(m)(i) (West 2018)); and (3) make reasonable progress toward the minor children's return within nine months after the neglect adjudication, specifically November 8, 2017, to August 8, 2018 (750 ILCS 50/1(D)(m)(ii) (West 2018)).

¶ 6        On December 12, 2018, the circuit court commenced the fitness hearing. The State presented the testimony of (1) Dr. Joel Eckert, a clinical psychologist who evaluated Brittany; (2) Laura Bell, a case supervisor employed by Camelot Care Center (Camelot); and (3) Chazla Johnson, a caseworker at Camelot. Respondent testified on his own behalf. Brittany testified on her own behalf and presented the testimony of (1) Laura Salesski, her family advocate at Primed for Life; (2) Brenda Wilder, her licensed counselor at Tazwood; (3) Mekya Lackey, her friend; and (4) Jesse Pilkington, her boyfriend. The evidence relevant to the issues on appeal is set forth below.

¶ 7        Bell testified she was assigned to supervisor the minor children's case in September 2017. When the minor children came into care, the caseworker examined respondent as a possible placement for the children. The caseworker concluded respondent was not a placement option because his parental rights to another child had been terminated in California. The caseworkers were never able to obtain the records from California.

¶ 8        As to the first service plan in this case, Bell testified it covered June 2017 to December 2017. Bell was unsure if respondent received a copy of the plan since he resided in California but believed one was mailed to him in October 2017. That plan required respondent to cooperate with an integrated assessment and the agency in general and attend parenting

classes. Respondent's caseworker spoke with respondent on the telephone in September and October 2017. When the first service plan was reviewed in December 2017, respondent received an overall unsatisfactory rating. Camelot did have a telephone number and address for respondent, and he participated in court by telephone. However, respondent did not attend parenting classes and visits with the children. When Skype, a telecommunications application that allows for video calls, was mentioned as a possibility for visits, respondent did not want to do that.

¶ 9        Additionally, Bell testified respondent participated in an integrated assessment in January 2018. Bell believed the delay in the integrated assessment was respondent's failure to return a telephone call. The following tasks were added to respondent's second service plan: (1) participate in a mental-health assessment, (2) participate in a substance-abuse assessment, (3) maintain a legal source of income, and (4) maintain adequate housing. A caseworker spoke to respondent about the services he needed to complete and asked him to try to identify providers in California. The second service plan was evaluated in June 2018. Respondent again received an overall unsatisfactory rating. Respondent only received a satisfactory rating for mental health. Respondent had participated in a mental-health assessment and attended the recommended counseling sessions. Respondent did complete a paternity test in June 2018 but did not attend any visits with the minor children. Bell testified respondent never sent gifts, cards, or letters to the minor children. When the integrated assessment was done with him, the caseworker informed respondent he could send the children such things. Respondent also did not attend parenting classes. Respondent received an unsatisfactory rating for housing because he lived in a small home with five other people, which was not adequate for the children. According to Bell, respondent did not have employment or did not provide proof of employment.

He also did not obtain a substance-abuse assessment and his telephone contact with the agency was sporadic. Respondent's tasks in the third service plan were the same as the second service plan. When the third service plan was evaluated, respondent again received an overall unsatisfactory rating. He received an unsatisfactory rating for mental health because respondent failed to attend sessions and participate in counseling.

¶ 10  Bell also testified DCFS and Camelot were never close to returning the minor children to respondent because respondent did not make significant progress on the service plan. According to Bell, respondent only completed the integrated assessment and paternity testing. Bell testified this case was referred to legal screening in June 2018 to determine whether the termination of parental rights should be pursued.

¶ 11  Johnson testified she was employed by Camelot as a caseworker from May 2017 to August 2018. She became the caseworker for the minor children in April 2018 when the second service plan was in place. Johnson testified respondent's tasks were to cooperate with the agency, attend parenting classes, complete a substance-abuse assessment, obtain adequate housing, maintain a legal source of income, and attend counseling. According to Johnson, no referrals had been made for respondent when she received the case. In June 2018, Johnson made a referral for respondent to obtain a substance-abuse assessment. On direct examination, Johnson testified a referral had been made for the mental-health assessment, but on cross-examination, she testified it had not been made. According to Johnson, she mailed respondent the second service plan with the information for calling into the administrative case review meeting for that plan, and respondent did not call into the June 2018 meeting. Johnson did not know for sure whether respondent received the second service plan she mailed to him.

¶ 12  Regarding the second service plan, Johnson testified respondent received an

overall unsatisfactory rating. As to cooperation with the agency, respondent did not sign releases and had limited contact with Johnson. According to Johnson, respondent had not obtained a mental-health assessment and was not attending counseling. Respondent was rated unsatisfactory for substance abuse, but the assessment referral had not been made at the time of the review. Respondent had not attended parenting classes, and Johnson could not recall if that referral had been made. Respondent's housing was also unsatisfactory because he lived with "[q]uite a few other people." Respondent did receive a satisfactory rating for legal income because he reported he was employed. No new tasks were added to respondent's third service plan. Johnson mailed respondent a copy of the third service plan, and respondent confirmed he received the service plan. Before Johnson left Camelot in August 2018, respondent did obtain a substance-abuse assessment, and no treatment was recommended. He also maintained regular contact with Johnson towards the end of her employment at Camelot. During their telephone conversations, Johnson and respondent only talked about his services. He did not mention the minor children.

¶ 13 Additionally, Johnson testified respondent did not visit with the minor children while she was the caseworker. He also never asked about visiting with the children. Moreover, respondent never inquired as to how the minor children were doing. He also did not send gifts, letters, or cards to the minor children. Johnson testified she was never close to returning the minor children to respondent because he had not completed any of his services and had not visited the children.

¶ 14 Salesski testified she was a family advocate for Brittany from early 2017 to June 2018. Her role was to help Brittany navigate the DCFS process and services. Salesski testified she attended one of Brittany's meetings at Camelot. Bell, Johnson, and the initial caseworker,

Asia Gentry, were present at the meeting. Salesski believed the meeting was in December 2017 or January 2018. During the meeting, Johnson stated respondent had not received a service plan. Brittany got respondent on the telephone for the meeting, and Gentry told respondent she would mail him a copy of the service plan. During the meeting, respondent stated he had tried to call the caseworker on numerous occasions and no one contacted him. Respondent indicated he wanted to engage in services.

¶ 15    Brittany testified she was currently 27 years old. She married respondent in March 2013. They moved several times, and K.L., Brittany's child from a prior relationship, was in temporary custody for a period. In October 2016, she and respondent separated, and she left their home in California and moved to Springfield, Illinois, with her two children (she was pregnant with the third) to live with her mother's sister. At the time of the fitness hearing, neither she nor respondent had initiated divorce proceedings. Additionally, Brittany testified DCFS started investigating her in May 2017.

¶ 16    After she separated from respondent, Brittany still frequently called him. She called respondent after every weekly visit to let him know how the minor children were doing. Brittany also sent him pictures of the minor children and would answer any questions he had about the children. Brittany tried to do a video chat with respondent during one of her visits with the children in August 2017, but Gentry told Brittany she could not do that. Gentry further stated respondent needed to set up his visitation services with the minor children. To her knowledge, respondent never did that. Brittany did testify she provided respondent's number to the caseworkers on multiple occasions.

¶ 17    Additionally, Brittany testified she attended a family team meeting in June 2018 and respondent was present on the telephone. Respondent asked why his telephone calls were

not being returned. He stated he wanted to know what was going on with the minor children and desired to set up visits. At the meeting, Johnson and Gentry were both present because Johnson was taking over as caseworker for Gentry. Brittany did not know if respondent had received a service plan at the time.

¶ 18　　　　Respondent testified he was 27 years old and currently lived in Cupertino, California. He shared a three-bedroom home with two adult male roommates and two adult female roommates. If the children lived with him, they would each have their own room, the two female roommates would share a room, and respondent and the two male roommates would share the living room. According to respondent, his roommates were fine with the arrangement. Respondent's name was not on the lease. He was a tenant at will. No one from Camelot had ever investigated his home.

¶ 19　　　　Gentry was the first person to contact him about the minor children's case. He completed an integrated assessment with her in August 2017. During the assessment, he provided Gentry with his address and telephone number, which had never changed. After the assessment, Gentry told respondent he was not a placement option for the minor children and informed him he would receive a service plan at his first court date. Except for his testimony, respondent had never been physically present for court. He was present at court proceedings by telephone. He did not recall receiving the service plan but was notified about it during court. Respondent understood he was to attend parenting classes, receive mental-health counseling, and complete a drug test. He asked for assistance with paying for his services, and his caseworker told him he would not receive any assistance.

¶ 20　　　　As to his services, respondent testified he completed the drug test in November 2017 and sent the results to Johnson. He completed a mental-health counseling program in July

- 8 -

2018 and again sent the results to Johnson. Respondent also signed a release with the counseling provider, allowing them to share their findings with the agency. Respondent testified he was aware of the nine-month period in Illinois for completing services. Respondent explained it took him so long to complete the mental-health evaluation because his work schedule needed to change so he could attend weekly counseling sessions and he needed to save money to pay for the counseling sessions. Respondent did not attend parenting classes because he had already attended two parenting classes when Brittany's other child, K.L., was taken into protective custody in California. He told Gentry about the classes during the integrated sessions, and she needed to contact the providers and confirm it. According to respondent, he had regular contact with Gentry, which respondent defined as once or twice a week. However, when Johnson took over the case, he did not hear from her on a regular basis, and Johnson did not return his messages. Respondent stated he had tried to get information on visitation but it had been very difficult to contact anybody about it.

¶ 21        After Brittany left California, he talked to the children a few times over video calls. However, the time difference and his work schedule made it very difficult for him to speak with the minor children. Respondent worked as a security guard from midnight to 8 a.m. and sometimes from 8 p.m. to 8 a.m., Sunday through Thursday. He needed to sleep during the day. Respondent had his current job since January 2017 and only got three days a year for vacation. He believed he talked with the minor children once or twice a month before they were taken into care. Respondent had not seen A.Q. since October 2016 and had never seen I.L. Respondent asked Brittany for the addresses of the foster parents in December 2017, but she never gave it to him. He admitted he never followed up on it. Respondent was not good with birthdays and worked a lot around the holidays. When asked I.L.'s birthdate, respondent did not know it.

¶ 22     Additionally, respondent testified he was charged with lewd and lascivious acts on a minor when he was 13 years old. He was ordered to complete counseling, which he did. When he was 18 years old, respondent also was convicted of a misdemeanor for possession of a knife. Additionally, respondent had a son when he was 17 years old, and his parental rights were terminated to that child. At the time, respondent was homeless, jobless, and did not know when the court proceedings were.

¶ 23     After hearing the parties' arguments, the circuit court found respondent and Brittany unfit on all grounds alleged in the petition. On April 25, 2019, the court entered the written adjudication order finding respondent unfit.

¶ 24     On June 13, 2019, the circuit court held the best-interests hearing. The State presented the testimony of Adrianna Stevenson, a caseworker at Camelot, and Brittany testified on her own behalf. Respondent did not appear in person at the hearing. At the conclusion of the hearing, the circuit court found it was in the minor children's best interests to terminate respondent's and Brittany's parental rights. On June 13, 2019, the court entered a written order terminating respondent's parental rights to the minor children.

¶ 25     On June 20, 2019, respondent filed a notice of appeal in sufficient compliance with Illinois Supreme Court Rule 303 (eff. July 1, 2017). See Ill. S. Ct. R. 660(b) (eff. Oct. 1, 2001) (providing the rules governing civil cases also govern appeals from final judgments in all proceedings under the Juvenile Court Act, except for delinquency cases). Thus, this court has jurisdiction of this appeal pursuant to Illinois Supreme Court Rule 307(a)(6) (eff. Nov. 1, 2017).

¶ 26                                II. ANALYSIS

¶ 27     Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2018)), the involuntary termination of parental rights involves a two-step process. First, the

State must prove by clear and convincing evidence the parent is "unfit," as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). *In re Donald A.G.*, 221 Ill. 2d 234, 244, 850 N.E.2d 172, 177 (2006). If the circuit court makes a finding of unfitness, then the State must prove by a preponderance of the evidence it is in the minor children's best interests that parental rights be terminated. *In re D.T.*, 212 Ill. 2d 347, 366, 818 N.E.2d 1214, 1228 (2004).

¶ 28        Since the circuit court has the best opportunity to observe the demeanor and conduct of the parties and witnesses, it is in the best position to determine the credibility and weight of the witnesses' testimony. *In re E.S.*, 324 Ill. App. 3d 661, 667, 756 N.E.2d 422, 427 (2001). Further, in matters involving minors, the circuit court receives broad discretion and great deference. *E.S.*, 324 Ill. App. 3d at 667, 756 N.E.2d at 427. Thus, a reviewing court will not disturb a circuit court's unfitness finding unless it is contrary to the manifest weight of the evidence. See *In re Gwynne P.*, 215 Ill. 2d 340, 354, 830 N.E.2d 508, 516-17 (2005). A circuit court's decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Gwynne P.*, 215 Ill. 2d at 354, 830 N.E.2d at 517.

¶ 29        Respondent contends the circuit court erred by finding him unfit. In this case, the circuit court found respondent unfit on three separate grounds. The State asserts it proved respondent was an unfit parent on all three grounds.

¶ 30        One of the grounds was under section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2018)). That section provides a parent may be declared unfit if he or she fails "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act." 750 ILCS 50/1(D)(m)(ii) (West 2018). Illinois courts have defined

- 11 -

"reasonable progress" as "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046, 871 N.E.2d 835, 844 (2007) (quoting *In re C.N.*, 196 Ill. 2d 181, 211, 752 N.E.2d 1030, 1047 (2001)). Moreover, they have explained reasonable progress as follows:

> " '[T]he benchmark for measuring a parent's "progress toward the return of the child" under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later became known and which would prevent the court from returning custody of the child to the parent.' " *Reiny S.*, 374 Ill. App. 3d at 1046, 871 N.E.2d at 844 (quoting *C.N.*, 196 Ill. 2d at 216-17, 752 N.E.2d at 1050).

Additionally, this court has explained reasonable progress exists when a circuit court "can conclude that *** the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991). We have also emphasized " 'reasonable progress' is an 'objective standard.' " *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88, 19 N.E.3d 227 (quoting *L.L.S.*, 218 Ill. App. 3d at 461, 577 N.E.2d at 1387).

¶ 31            In determining a parent's fitness based on reasonable progress, a court may only consider evidence from the relevant time period. *Reiny S.*, 374 Ill. App. 3d at 1046, 871 N.E.2d

- 12 -

at 844 (citing *In re D.F.*, 208 Ill. 2d 223, 237-38, 802 N.E.2d 800, 809 (2003)).  Courts are limited to that period "because reliance upon evidence of any subsequent time period could improperly allow a parent to circumvent her own unfitness because of a bureaucratic delay in bringing her case to trial."  *Reiny S.*, 374 Ill. App. 3d at 1046, 871 N.E.2d at 844.  In this case, the petition alleged the relevant nine-month period was November 8, 2017, to August 8, 2018.

¶ 32        Respondent first contends he did not receive the entire nine-month period because Camelot referred the case for a legal screening in June 2018, two months before the expiration of the nine-month period.  However, as the circuit court explained in sustaining an objection, legal screening does not terminate the case.  Additionally, the State argues respondent did not cite any legal authority supporting his contention, and thus respondent forfeited this argument.  See *People v. Oglesby*, 2016 IL App (1st) 141477, ¶ 205, 69 N.E.3d 328 (noting the failure to cite any authority for an argument will result in forfeiture of that argument on appeal).  In response, respondent asserts he was unable to cite any authority because it was a matter of first impression. We note respondent's argument consisted of only one sentence.  Thus, we agree with the State respondent has forfeited his argument because it is simply a bare assertion of error.  See *City of Elgin v. Arch Insurance Co.*, 2015 IL App (2d) 150013, ¶ 39, 53 N.E.3d 31 (finding argument forfeited where the argument consisted of bare assertion without elaboration or legal citation).

¶ 33        Even assuming respondent completed the proper counseling sessions, the correct parenting classes, and satisfied the substance-abuse task, respondent had no contact with the minor children during the nine-month period.  According to the caseworkers, respondent did not even ask questions about the children's well-being.  Respondent had never seen I.L. in person and did not know her birthdate.  He had also limited video contact with the minor children during the year before they came into care.  As the circuit court noted, the minor children did not know

- 13 -

respondent. Additionally, he did not have suitable housing since he shared a three-bedroom home with four other adults and his name was not on any lease. Given respondent had failed to maintain a relationship with the minor children during the nine-month period, the court was never close to being able to return the minor children to respondent during that period.

¶ 34        Accordingly, we conclude the circuit court's finding respondent unfit based on section 1(D)(m)(ii) of the Adoption Act was not against the manifest weight of the evidence. Since we have upheld the circuit court's determination respondent met the statutory definition of an "unfit person" on the basis of failure to make reasonable progress (750 ILCS 50/1(D)(m)(ii) (West 2018)), we do not address the other bases for respondent's unfitness finding. See *In re Tiffany M.*, 353 Ill. App. 3d 883, 891, 819 N.E.2d 813, 820 (2004).

¶ 35                              III. CONCLUSION

¶ 36        For the reasons stated, we affirm the Sangamon County circuit court's judgment.

¶ 37        Affirmed.